## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JENNIFER A. HADSALL, Regional Director of Region 18 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, <br><br> Petitioner <br><br> v. <br><br> ADT, LLC, <br><br> Respondent | Civil No. 3:21-cv-9 |

## PETITIONER'S MEMORANDUM OF LAW IN SUPPORT OF ITS PETITION FOR PRELIMINARY INJUNCTION UNDER SECTION 10(j) OF THE ACT

The Petitioner, Jennifer A. Hadsall, Regional Director of Region 18 of the National Labor Relations Board (NLRB or Board), for and on behalf of the NLRB, seeks injunctive relief against ADT, LLC (Respondent) under Section 10(j) of the National Labor Relations Act (Act).[1] Petitioner seeks this relief to prevent irreparable harm to the collective-bargaining rights of employees and to protect the effectiveness of the Board's final remedy in the underlying administrative case. Protecting collective-bargaining rights is integral to protecting the public interest behind the Act. As recognized by the Seventh Circuit in *Bloedorn v. Francisco Foods, Inc.,*[2] "[t]he deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable" and leads to "irreparable harm to the collective bargaining process." Respondent's conduct threatens these rights and, in turn, the public interest.

---

[1] 29 U.S.C.§ 160(j).

[2] *Bloedorn v. Francisco Foods, Inc.,* 276 F.3d 270, 299 (7th Cir. 2001).

Specifically, in September 2020, Respondent unlawfully withdrew recognition from the International Brotherhood of Teamsters, Local Union No. 364, AFL-CIO (Union), which had represented a bargaining unit of employees of the Respondent for over 26 years, and thereafter made unlawful unilateral changes to terms and conditions of employment without giving the Union the opportunity to bargain with Respondent with respect to this conduct. By this conduct, Respondent has failed and refused (and continues to fail and refuse) to bargain collectively and in good faith with the Union within the meaning of Section 8(d) of the Act.[3]

This conduct falls squarely within the confines of Section 10(j) of the Act, which is designed to prevent remedial failure during the pendency of the Board's often lengthy administrative proceedings. Without such relief, Respondent will successfully cripple the public's interest in effective collective-bargaining rights of employees to freely choose their bargaining representative.

## I.   THE STATUTORY SCHEME PURSUANT TO WHICH INJUNCTIVE RELIEF IS SOUGHT: THE APPLICABLE STANDARDS

Section 10(j) of the Act authorizes United States district courts to grant temporary injunctions pending the Board's resolution of unfair labor practice proceedings.[4] Congress recognized that the Board's administrative proceedings often are protracted. In many instances, absent interim relief, a respondent could accomplish its unlawful objective before being placed under any legal restraint, and it could thereby render a final Board order ineffectual.[5] Thus,

---

[3] 29 U.S.C. § 158(d).

[4] *See Harrell v. American Red Cross*, 714 F.3d 553, 556 (7th Cir. 2013); *Lineback v. Spurlino Materials, LLC,* 546 F.3d 491, 499 (7th Cir. 2008); *Bloedorn*, 276 F.3d at 286.

[5] *See* S. Rep. No. 105, 80th Cong., 1st Sess., at pp. 8, 27 (1947), reprinted in I *Legislative History of the Labor Management Relations Act of 1947* at pp. 414, 433 (Government Printing Office 1985).

2

Section 10(j) was intended to prevent the potential frustration or nullification of the Board's remedial authority caused by the passage of time inherent in Board administrative litigation.[6]

Section 10(j) directs district courts to grant relief that is "just and proper." The Seventh Circuit holds that in determining what relief is "just and proper," district courts should apply the general equitable standards for considering requests for preliminary injunctions.[7] The Petitioner is entitled to interim relief when: (1) the Petitioner has no adequate remedy at law; (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction; (3) "public harm" would occur in the absence of interim relief; and (4) the Petitioner has a reasonable likelihood of prevailing on the merits of the complaint.[8]

The Petitioner bears the burden of establishing the first, third, and fourth prongs by a preponderance of the evidence.[9] "The second prong is evaluated on a sliding scale: the better the Director's case on the merits, the less its burden to prove that the harm in delay would be irreparable, and vice versa."[10]

---

[6] See Lineback v. Irving Ready-Mix Inc., 653 F.3d 566, 570 (7th Cir. 2011); Spurlino Materials, 546 F.3d at 500.

[7] Spurlino Materials, 546 F.3d at 499–500; Bloedorn, 276 F.3d at 286; NLRB v. Electro-Voice, Inc., 83 F.3d 1559, 1566 (7th Cir. 1996).

[8] Harrell, 714 F.3d at 556; Spurlino Materials, 546 F.3d at 500; Bloedorn, 276 F.3d at 286.

[9] Spurlino Materials, 546 F.3d at 500; Bloedorn, 276 F.3d at 286.

[10] Spurlino Materials, 546 F.3d at 500 (internal citations omitted).

### A. Likelihood of success

The Petitioner makes a threshold showing of likelihood of success by showing that its chances are "better than negligible."[11] Thus, in a 10(j) proceeding, the district court should determine whether "the Director has 'some chance' of succeeding on the merits."[12] In assessing whether the Petitioner has met this burden, a district court must take into account that Section 10(j) confers no jurisdiction to pass on the ultimate merits of the unfair labor practice case.[13] The Court's inquiry is confined only to "the *probability* that the Director will prevail."[14] Further, the Court must be "hospitable" to Petitioner's view of the law, given the Board's expertise in matters of labor relations.[15]

The District Court will be basing its decision based on the written record before the Administrative Law Judge. In these circumstances, the Court "owe[s] the Director a favorable construction of the evidence, much as we would if he were a plaintiff appealing the grant of summary judgment in favor of the defendant."[16] In doing so, the district court should not resolve credibility conflicts in the evidence.[17] The Court should credit the Director's version of the facts so long as they are "plausible" based on the record.[18]

---

[11] *Spurlino Materials, LLC,* 546 F.3d at 502; *NLRB v. Electro-Voice, Inc.*, 83 F.3d at 1568.

[12] *Harrell,* 714 F.3d at 556; *Spurlino Materials,* 546 F.3d at 502.

[13] *Spurlino Materials*, 546 F.3d at 502; *Electro-Voice*, *Inc.,* 83 F.3d at 1567.

[14] *Bloedorn,* 276 F.3d at 287 (emphasis in original; *citing Electro-Voice, Inc.,*83 F.3d at 1570).

[15] *Bloedorn*, 276 F.3d at 287 (7th Cir.2001); *Spurlino Materials,* 546 F.3d at 502.

[16] *Bloedorn,* 276 F.3d at 287.

[17] *Electro-Voice, Inc.,* 83 F.3d at 1570–71.

[18] *Bloedorn, Inc.,* 276 F.3d at 287., citing *Electro–Voice, Inc.,* 83 F.3d at 1570.

**B. No adequate remedy at law and the balance of the equities and public interest**

The inquiry into an adequate remedy at law, the balance of harms, and the public interest overlap. In the Seventh Circuit, "the adequate remedy at law inquiry is whether, in the absence of immediate relief, the harm flowing from the alleged violation cannot be prevented or fully rectified by the final Board order."[19] Irreparable harm to collective bargaining leads to Board remedial failure and harms the public interest in protecting collective bargaining and deterring future violations.[20] "[T]he interest at stake in a section 10(j) proceeding is 'the public interest in the integrity of the collective bargaining process.'"[21]

## II. PETITIONER DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS AT THE UNDERLYING ADMINISTRATIVE HEARING

**A. Case overview**

This case arises from Respondent's unlawful withdrawal of recognition from the Union, which took place after Respondent closed its unionized Rockford, Illinois, facility and its non-unionized Madison, Wisconsin, facility, and relocated both groups of employees to a new facility in Janesville, Wisconsin. Approximately one year after the relocation, upon expiration of the collective-bargaining agreement covering the former Rockford unit employees, Respondent withdrew recognition from the Union and implemented unilateral changes to the unit employees' terms and conditions of employment. Respondent's actions violated Section 8(a)(5) and (1) of the Act.

---

[19] *Harrell,* 714 F.3d at 557. (internal citations and quotations omitted).

[20] *See Squillacote v. Local 248, Meat & Allied Food Workers,* 534 F.2d 735, 744 (7th Cir. 1976) (the irreparable harm to be avoided in a Section 10(j) case is the threatened frustration of the remedial purpose of the Act and of the public interest in deterring continued violations).

[21] *Bloedorn,* 276 F.3d at 300 (internal citations omitted); *see also Harrell,* 714 F.3d at 557.

This is not the first time that Respondent has engaged in this type of conduct and, in fact, the controlling case in this area is *ADT Security Services*, 355 NLRB 1388 (2010), enforced 689 F.3d 628 (6th Cir. 2012) (referred to herein as *ADT I*), where Respondent engaged in almost identical conduct to the case at bar, and the Board concluded that its withdrawal of recognition was unlawful. The Board made clear that where, as here, a unit continues to maintain its integrity and separate identity, and there is a significant history of collective bargaining, the burden is on the respondent employer to demonstrate compelling circumstances to overcome the significance of the bargaining history.[22]

The structure of this section will begin with a recitation of the relevant facts, including: the parties' lengthy and significant bargaining history; detailed facts showing that the former Rockford employees' terms and conditions of employment remained almost entirely the same following the relocation to the Janesville facility and that Respondent continued to treat the former Rockford employees as a separate and distinct group from the former Madison employees; Respondent's withdrawal of recognition of the Union; and the subsequent unilaterally implemented changes to the unit employees' terms and conditions of employment. The fact section will be followed by a legal analysis applying the controlling *ADT I* case to the facts of this case. This analysis will show that, as in *ADT I*, there existed a lengthy collective-bargaining relationship between Respondent and the Union, the former Rockford Unit employees maintained their separate identity after the relocation, and that Respondent completely failed to meet its burden of demonstrating compelling circumstances to overcome the significant bargaining history. This will be followed by an analysis of the unlawful unilateral changes

---

[22] *ADT I*, 355 NLRB 1388 (2010), *enforced, N.L.R.B. v. ADT Sec. Servs., Inc.,* 689 F.3d 628 (6th Cir. 2012).

implemented by Respondent after its withdrawal of recognition. Last, the legal analysis section will briefly address Respondent's anticipated defenses.

### B. Facts

####     i.     Background, bargaining history, and the move from Rockford to Janesville

Respondent is a global company that installs and services residential and commercial security systems throughout the United States.[23] [24] This case concerns a bargaining unit originally located out of Respondent's former facility in Rockford, Illinois.[25] The Union was certified as the collective-bargaining representative for the installers and technicians[26] out of the Rockford, Illinois facility (herein, the "former Rockford Unit," "former Rockford technicians," or "former Rockford employees") on October 21, 1994, and the parties have been party to at least eight collective-bargaining agreements since then.[27] The most recent collective-bargaining agreement covering those workers was effective from September 1, 2017, to August 31, 2020.[28]

In about August of 2019, Respondent closed both its Rockford facility and an unrepresented facility in Madison, Wisconsin, and opened a new facility about halfway between the two in Janesville, Wisconsin.[29] The former Rockford employees began working out of a

---

[23] Tr. 42.

[24] "Tr." references are to the transcript of the unfair labor practice hearing; "GCX" references are to exhibits entered at the hearing by the Petitioner; "RX" references are to exhibits entered by Respondent; "p" references an exhibit's page number.

[25] Tr. 43, 52; GCX 1(r).

[26] References to "technicians" will include both service technicians and service installers.

[27] Tr. 43; GCX 2, 3-10.

[28] Tr. 45, 58; GCX 3.

[29]  GCX 1(u), GCX 11.

temporary facility in Janesville, Wisconsin, prior to moving to the permanent one.[30] The Madison employees did not join the group at the temporary facility, but only later, during fall/early winter 2019, did both groups begin working out of the permanent facility in Janesville.[31] It is undisputed, that at the time the two groups began working out of the permanent Janesville facility, the former Rockford employees outnumbered the Madison employees.[32] [33]

Prior to the move, Matt Ides, Respondent's Team Manager High Volume Install who managed the Rockford facility, assured the Rockford employees that everything would remain the same, "[t]hat we were going to stay in the Union, that everything would stay exactly the same as it is, nothing would change and [Rockford and Madison employees] would still stay separated."[34] Indeed, when asked what would change by the Union's Assistant Business Manager Larry Rowlett, Respondent's General Manager Shawn Bell replied, "Everything will stay the same. I mean, [the former Rockford Unit] would be working under that Collective Bargaining Agreement and everything would be the same other than when they went to an office location, it would be a different location. It would no longer be in Rockford."[35] In fact, it is uncontested that the collective-bargaining agreement continued to be applied only to the former Rockford employees after the move to Janesville and that Respondent continued to apply the same terms and conditions of employment exclusively to the former Rockford employees until it unlawfully withdrew recognition from the Union almost a year later.[36]

---

[30] Tr. 51-52, 77, 99.

[31] Tr. 99, 102, 184, 221, 224, 225.

[32] Tr. 103, 104, 444-445.

[33] Tr. 103, 104, 444-445.

[34] Tr. 56-57, 255-56.

[35] Tr. 57.

[36] Tr. 57, 136-141, 231, 238, 260, 263-65.

ii.     **Former Rockford Unit employees' terms and conditions pre-move**

Before the move, the former Rockford Unit would be dispatched from their homes directly to jobs scheduled by Respondent and were most often sent around the greater Rockford area to service and install residential security systems along with some light commercial assignments.[37] Though there were no defined boundaries serviced by the Rockford facility, the former Rockford employees spent most of their time in Illinois and were seldom assigned to locations in Wisconsin other than to Beloit, located on its southern border and only about 16 miles from the former Rockford facility.[38] On those rare occasions that they did travel further into Wisconsin, they would go up to Madison and even further north.[39]

The former Rockford employees' schedules were assigned and communicated to the Rockford Unit by computer, which set forth their schedule for the day.[40] The former Rockford employees would visit the Rockford facility for a regularly scheduled weekly parts pickup and to exchange and recycle equipment on Fridays and on an as-needed basis.[41] The former Rockford employees' direct supervisor, Matt Ides, managed both of the Rockford and Madison facilities and shared his time between the two locations.[42] The former Rockford employees communicated with Mr. Ides multiple times daily, either by text message or by phone for purposes of scheduling or parts issues.[43] They worked alone for most of their time and only worked with another

---

[37] Tr. 118, 120, 219, 232, 240.

[38] Tr. 118, 120-121, 241-242, 301, 307, 317.

[39] Tr. 121, 242.

[40] Tr. 240.

[41] Tr. 112, 114-115, 233, 244.

[42] Tr. 116, 220.

[43] Tr. 115, 116, 236-239.

technician when assigned or due to the nature of the job.[44] When assigned to work with another technician, the former Rockford employees worked almost exclusively with other former Rockford technicians and only on occasion worked with a technician from Madison.[45] The former Rockford technicians all had a certification to work in Illinois; there were no certification requirements to work in Wisconsin.[46]

While working out of the Rockford facility, all the terms of the collective-bargaining agreement were applied to the Rockford Unit employees, including wages, overtime, vacation, and grievance procedure, among others.[47] The agreement's terms were not applied to the Madison technicians.[48] Pursuant to the collective-bargaining agreement, Respondent remitted dues to the Union for each former Rockford Unit employee.[49] Respondent maintained an emergency after hours on-call list, which contained two names per week: one former Rockford technician and one Madison technician, each covering their respective territories due to the emergency nature of the calls.[50]

Prior to the move, the former Rockford technicians interacted with the Madison technicians infrequently when they worked together or exchanged parts in the field and when they picked up parts at the Madison facility.[51]

---

[44] Tr. 233-234.

[45] Tr. 235.

[46] Tr. 244, 245.

[47] Tr. 57, 110, 229, 230; GCX 3.

[48] Tr. 58.

[49] GCX 3.

[50] Tr. 129, 247-249.

[51] Tr. 113, 225, 234-235.

### iii.      Former Rockford Unit employees' terms and conditions post-move

After the move to Janesville[52] the Rockford unit employees' terms and conditions of employment did not materially change. They continued to be dispatched from their homes.[53] Their job descriptions and pay remained the same.[54] The licensing requirements for working in Illinois remained the same.[55] The former Rockford Unit continued to be assigned daily schedules in the same way.[56] The type and percentage of work that was residential versus commercial remained the same.[57] Apart from going to the Janesville facility weekly for parts pick up, the former Rockford technicians' geographic service area continued to be the same as before, with the general Rockford area being the predominant area that they serviced.[58]

The former Rockford technicians also continued to report directly to the same supervisor, Matt Ides, with only a slight decrease in face-to-face contact, due to Ides now working out of the Janesville facility and the former Rockford technicians continuing to work primarily out of the Rockford area. As one former Rockford technician explained, "it wasn't easy for [supervisor Ides] to just jump in the car and bring me a part."[59]

---

[52] The Rockford unit employees first moved to a temporary facility located in Janesville, Wisconsin, prior to moving to the permanent facility. (Tr. 221). For purposes of this Memorandum, Petitioner collectively refers to the temporary and permanent Janesville locations as the Janesville location, unless otherwise stated.

[53] Tr. 136.

[54] Tr. 136, 256, 258.

[55] Tr. 136, 258-259.

[56] Tr. 136, 256.

[57] Tr. 137, 259.

[58] Tr. 137, 259-260.

[59] Tr. 137-138, 260.

Just as before the move to Janesville, the former Rockford technicians continued to be scheduled to pick up parts at the new Janesville facility on Fridays.[60] [61] They continued to earn the same overtime rate as set forth in the collective-bargaining agreement.[62] The same on-call system remained in place and the on-call list continued to list two names for each week: one former Rockford technician and one Madison technician, each servicing their respective areas.[63] The former Rockford technicians also continued to earn the same on-call rate as set forth in the collective-bargaining agreement.[64]

Interactions with Madison technicians in the field also largely remained the same.[65] However, the former Rockford technicians testified they may randomly see a Madison technician a little more frequently if they happen to be in the Janesville facility to pick up a part at the same time.[66] After moving to Janesville, the former Rockford technicians and Madison technicians had about two in-person training sessions at the new facility; the first session took place during the end of 2019 and the second session occurred in January 2020.[67]

### iv.    The Union filed and withdrew a representation petition

On May 8, 2020, the Union filed a representation petition to create a new bargaining unit in Janesville consisting of both the former Rockford Unit and the other technicians now working

---

[60] Madison technicians were scheduled to pick up parts on Tuesdays. (Tr. 139).

[61] Tr. 138.

[62] Tr. 139.

[63] Tr. 139, 147-148, 263-264; GCX 30 (Note, GCX 30 was inadvertently marked with a GCX 29 stamp in the administrative hearing record.)

[64] Tr. 264.

[65] Tr. 140-141, 265, 306-307.

[66] Tr. 140-141, 265, 306-307.

[67] Tr. 143-145.

out of the Janesville facility. The representation petition was withdrawn by the Union one week later and no election was held.[68]

### v. Respondent announced it would withdraw recognition from the Union

During the spring of 2020, Respondent received a decertification petition signed solely by former Madison and other newly hired employees seeking to decertify the Union that had never represented them.[69] Purportedly based on this petition, Respondent notified the Union of its intention to withdraw recognition upon the expiration of the current collective-bargaining agreement by letter on June 22, 2020.[70]

On July 6, 2020, the Union responded to Respondent's notice, by letter, disputing Respondent's assertion that a majority of employees from the former Rockford bargaining unit sought to decertify the Union. The letter stated, in part, "To our knowledge, ADT has never applied the terms of the Local 364 agreement to any other employees who may be working in the Janesville location. The Rockford bargaining unit members who were transferred to Janesville continue to want [the Union] to represent them, and none have signed any such petition, as claimed by ADT. To the extent such a petition was signed by employees outside of the Rockford bargaining unit, [the Union] has never asserted that they are bound by or covered by [sic] Rockford collective bargaining agreement."[71] The administrative record clearly demonstrates that not a single former Rockford Unit employee signed the petition.[72] Indeed, Respondent's

---

[68] Tr. 305, 395; GCX 12, 13.

[69] Tr. 150, 432, 443-444; GCX 14.

[70] Tr. 58-59, 430-432; GCX 15.

[71] Tr. 62; GCX 16.

[72] Tr. 153; GCX 14.

own Director of Labor Relations James Nixdorf testified that Respondent never considered the non-former Rockford employees to be part of the bargaining unit.[73] Respondent never replied to the Union's July 6, 2020, letter in response to Respondent's notice to withdraw recognition., nor did it reply to any of the seven subsequent requests to bargain made by the Union.[74] Respondent carried out its stated intentions and ultimately withdrew recognition from the Union on August 31, 2020.[75]

### vi.   Post-withdrawal unilateral changes

Following Respondent's unlawful withdrawal of recognition, it made unilateral changes to the former Rockford Unit's terms and conditions of employment, including changing the method of compensation, overtime and paid time off, implementing a bonus system that had been previously offered only to the non-represented employees and instituting a new performance review system.[76] [77]

a.   *Method of compensation*. Prior to the withdrawal of recognition, the former Rockford Unit employees were paid according to the longevity-based wage scale set forth in the collective-bargaining agreement's Schedule "A."[78] After withdrawal, and during about

---

[73] Tr. 58, 444.

[74] Tr. 64-66; GCX 17-23.

[75] Tr. 58.

[76] Tr. 160-167, 176-179, 271; GCX 1(u).

[77] Respondent denied making any unilateral changes in its first Answer to Petitioner's underlying administrative Complaint yet admitted making them in this District Court proceeding. (GCX 1(i), GCX 31). During the administrative hearing, after being confronted with its response to this District Court proceeding, Respondent amended its answer to partially admit having made the alleged unilateral changes. (GCX 1(u)).

[78] GCX 3, p 22.

September 2020, Respondent increased wages for the former Rockford unit employees between $.12 and $.71 per hour, averaging about $.57 per hour increase among the five former Rockford Unit technicians.[79] Respondent also made increases dependent on employees meeting certain criteria and training.[80]

       **b.**    ***Overtime***. Prior to the withdrawal of recognition, Article 14 of the collective-bargaining agreement set forth the overtime structure, whereby former Rockford employees would earn the overtime rate after working 8 hours each day, regardless of how many hours were worked that week.[81] After the withdrawal of recognition, Respondent changed the overtime policy so that employees need to work 41 hours in a week to get one hour of overtime.[82] Holidays and other paid time off are also no longer included in the calculation for overtime.[83]

       **c.**    ***Paid time off***. Prior to the withdrawal of recognition, the former Rockford Unit employees earned separate vacation time and sick time, which were set forth in Articles 12 and 19 of the collective-bargaining agreement, respectively.[84] Since the withdrawal of recognition, Respondent no longer offers the former Rockford employees separate vacation and sick time, but instead gives them one lump-sum category of paid time off.[85] Paid time off is now

---

[79] GCX 33, p 3-4; Former Rockford Unit employees: David Anderson, Gabriel Files, Jon Frazier, Scott Joswick, and Danny Sissum.

[80] Tr. 164-165, 269, 271.

[81] Tr. 165; GCX 3, p 11-12.

[82] Tr. 165-166, 269, 271.

[83] Tr. 165-166, 269, 271.

[84] Tr. 160; GCX 3.

[85] Tr. 167-168, 271.

dependent on the hours worked each week.[86] The former Rockford employees can also now sell their paid time off back to Respondent and roll over up to 40 hours of paid time into the next year.[87]

> **d.    Bonus eligibility**. Prior to the withdrawal of recognition, the former Rockford Unit employees were not eligible to earn bonuses.[88] Upon withdrawal of recognition, Respondent implemented a new performance-based bonus plan.[89] Under the new bonus structure, the former Rockford employees earn hundreds of dollars per month.[90]

> **e.    Performance Review System**. Since approximately mid-2020, the former Rockford employees were tasked with notifying customers about a survey program called Medallia.[91] Whereas prior to the withdrawal of recognition, the customer responses had no effect on compensation, after the withdrawal, the responses are factored into employees' performance reviews and, ultimately, their compensation.[92]

### C. Respondent withdrew recognition from the Union in violation of Section 8(a)(5) of the Act

#### i.    *ADT I* controls the instant case

As noted above, the legal rubric to be applied to the facts in the instant case are set forth in the Board's decision in *ADT I*.[93] That case involved Respondent's unlawful withdrawal of

---

[86] Tr. 167-168, 271.

[87] Tr. 160, 166-167, 269, 271.

[88] Tr. 160.

[89] Tr. 164-165, 273; GCX 34.

[90] Tr. 165, 271, 274-275.

[91] Tr. 176-177.

[92] Tr. 176-178, 282-283.

[93] *ADT I*, 355 NLRB 1388 (2010), *enforced*, *N.L.R.B. v. ADT Sec. Servs., Inc.,* 689 F.3d 628, 632 (6th Cir. 2012).

recognition from a different union that represented another unit of employees that had also been relocated to another facility.[94] The issue in *ADT I*, and in the instant case, is whether a represented unit with a long bargaining history, after being transferred to a new facility with other unrepresented workers, continued to maintain its integrity and separate identity. When, as in *ADT I* and also here, the unit maintains its integrity and there is a significant history of collective bargaining, the burden is on Respondent to demonstrate *compelling circumstances* to overcome the significance of this bargaining history.[95]

> ii.     **The facts and legal findings in *ADT I***

In *ADT I*, the union represented employees at Respondent's Kalamazoo, Michigan facility for 29 years.[96] Respondent closed the Kalamazoo facility and transferred the 14 represented employees to its Wyoming, Michigan, location, out of which 27 non-represented service employees also worked. Respondent withdrew recognition from the Union as of the date of the consolidation.[97] After their transfer to the Wyoming facility, Respondent continued to pay the Kalamazoo employees their contractual wage rate, which was more than the rate paid to the Wyoming employees.[98] The Kalamazoo employees reported to Wyoming and no longer operated under separate supervision.[99] They continued to perform the same work (the installation and service of security systems) in the same distinct geographical area (the Kalamazoo service territory), under largely unchanged terms and conditions of employment, including separate on-

---

[94] *Id.*

[95] *Id.*

[96] *Id.*

[97] *Id.* at 1393.

[98] *Id.* at 1394.

[99] *Id.* at 1393.

call lists (to handle emergencies on nights and weekends) for commercial and residential service.[100] Both before and after the transfer to Wyoming, the Kalamazoo unit employees were dispatched from home and performed work in the field, reporting originally to the Kalamazoo facility only to turn in their timesheets and pick up supplies, and later, after closing, reporting to the Wyoming facility only once a week to replenish their parts supply.[101]

Finding that Respondent unlawfully withdrew recognition from the union, the Board noted that when evaluating whether an existing unit remains appropriate in light of changed circumstances, the Board gives *significant weight* to the parties' history of bargaining: "Specifically, our caselaw holds that '*compelling circumstances*' are required to overcome the significance of bargaining history."[102]

The Board found that the historical unit of Kalamazoo servicemen maintained its integrity following the closure of the Kalamazoo facility and remained an appropriate unit with which Respondent was obligated to bargain.[103] Respondent was not privileged to withdraw recognition from the Union as the collective-bargaining representative of the Kalamazoo unit

---

[100] *Id.* at 1388, 1393 and 1394.

[101] *Id.* at 1388, 1393 and 1394.

[102] *Id.* at 1388 *(emphasis added)* (quoting *Radio Station KOMO-AM*, 324 NLRB 256 (1997)). *See also Dallas Air Motive, Inc.*, 370 NLRB No. 3 (2020) (noting it was the respondent's burden to show that the represented bargaining unit was no longer an appropriate unit for bargaining after being combined with a similar group of employees at a new facility because it did not have an identity distinct from the combined group of employees); *Children's Hosp. of San Francisco*, 312 NLRB 920 (1993) ), *enforced*, 87 F.3d 304 (9th Cir. 1996) (finding that the administrative law judge's reliance on bargaining history in finding a unit of registered nurses to be appropriate was not erroneous).

[103] *Id.* at 1389, citing *Comar, Inc.*, 339 NLRB 903, at 903 fn. 2, *See Frontier Telephone of Rochester, Inc.*, 344 NLRB 1270, 1272 fn. 10 (2005), *enforced mem.*, 181 Fed. App'x 85 (2d Cir. 2006).*enforced mem.*, 111 Fed. App'x 1 (D.C. Cir. 2004).

because the bargaining unit maintained its integrity and Respondent could not establish that the Kalamazoo unit employees were "absorbed" or "integrated" into a unit including all the servicemen who worked out of the Wyoming facility. Some of the most fundamental terms of employment that distinguished the Kalamazoo servicemen from the Wyoming servicemen included the: (1) location of their work; (2) their rate of pay; and (3) their separate, dual "on call list." The Board noted that these factors remained intact following the close of the Kalamazoo facility and continued to separate them from the Wyoming servicemen.[104] In addition, the Board noted that the closing of the Kalamazoo facility was of less significance than it would have been had the employees actually performed work at the facility; instead, after the closing, the Kalamazoo employees continued to perform work in the field and reported to the Wyoming facility only once a week to replenish their parts supply. Given the separate identity of the Kalamazoo bargaining unit, Respondent was unable to demonstrate compelling circumstances sufficient to overcome the parties' lengthy bargaining history.[105]

Notably, after the administrative hearing and prior to the Board's decision in *ADT I*, the Regional Director filed a petition with the district court seeking a temporary injunction that required Respondent to, inter alia, recognize the Union and rescind certain unilateral changes. The district court denied the petition and the Director appealed. The Sixth Circuit reversed and remanded, holding that the Director demonstrated reasonable cause to support injunctive relief.[106]

---

[104] *Id.* at 1388

[105] *Id.*

[106] *Glasser ex rel. N.L.R.B. v. ADT Sec. Servs., Inc.*, 379 F. App'x 483, 487 – 489. (6th Cir. 2010).

### iii.         There is a lengthy bargaining history in the instant case

As in *ADT I*, Respondent and the Union have a lengthy collective-bargaining history. Here, the collective-bargaining relationship spanned over 26 years. The Union was certified as the representative of the bargaining unit in 1994, and the parties subsequently entered into at least eight collective-bargaining agreements, including the most recent agreement that expired on August 31, 2020.[107]

### iv.         The Rockford Unit maintained its integrity and separate identity

Like the Kalamazoo unit, the Rockford Unit maintained its integrity and separate identity after the relocation to Janesville and prior to the unlawful withdrawal of recognition on about September 1, 2020.[108] The Board in *ADT I* noted that the Kalamazoo unit employees "continued to perform the same work in the same distinct geographical area under largely unchanged terms and conditions of employment."[109] This continuity in work and terms and conditions of employment is also present in the instant case.

After the relocation to Janesville and prior to the unlawful withdrawal of recognition, the former Rockford employees continued to perform the same installation and service work in the de facto defined Rockford territory under largely unchanged terms and conditions of employment, including those set forth in the still-applied collective-bargaining agreement.[110]

---

[107] GCX 2 – 10.

[108] The post-withdrawal unilateral changes to Unit employees' terms and conditions of employment are unfair labor practices and do not factor into an analysis of whether the Rockford unit maintained its integrity and separate identity prior to the unlawful withdrawal of recognition.  *See Comar*, 339 NLRB at 911 (noting that unlawful changes do not establish that the unit lost its separate identity because "[t]o hold otherwise would allow [r]espondent to benefit from its own unlawful conduct").

[109] *ADT I*, 355 NLRB at 1388.

[110] Tr. 57, 136 – 141, 257 – 265.

Post-relocation and prior to the withdrawal of recognition, Respondent continued to apply the collective-bargaining agreement in its entirety to the former Rockford Unit.[111] Their contractual terms and conditions of employment, including but not limited to wages, overtime, and on-call rates remained the same.[112] The terms of the collective-bargaining agreement were not applied to the non-represented former Madison employees.[113] Accordingly, given the breadth of the contractual terms, their continued application to the former Rockford Unit is a key factor indicating these employees maintained their own separate identity.

In addition to being distinguished by the application of contractual wages and terms to the former Rockford Unit employees, the two groups were further distinguished by the location of their work. The former Rockford employees worked in the same geographic area both before and after the relocation to Janesville, primarily in Rockford and the surrounding area.[114] Former Rockford employee Danny Sissum continues to spend the majority of his working time in Rockford and the surrounding area. The remainder of the time, he may be sent to Iowa, or Beloit, Wisconsin, a town on the border of Illinois and Wisconsin. Sissum described the amount of time he works in Wisconsin as minimal, mostly in Beloit but sometimes in Madison or further north.[115] Former Rockford employee David Anderson also continues to spend most of his working time in Rockford and its surrounding area. He works in Beloit, but otherwise does not often work in Wisconsin.[116]

---

[111] Tr. 57 – 58, 110, 230 – 231.

[112] Tr. 109 – 110, 140, 256, 263.

[113] Tr. 58.

[114] Tr. 137, 259.

[115] Tr. 120 – 121.

[116] Tr. 240 – 242.

The separation of the former Rockford employees and the former Madison employees by geographic area is evident in the on-call list, which existed in the same format both prior to and after the relocation to Janesville.[117] A former Rockford employee and a former Madison employee are assigned to be "on-call" and respond to emergency calls for each week of the year.[118] The former Rockford employees are able to switch their assignments with other former Rockford employees.[119] As Sissum explained, it would not be feasible to have the former Rockford employees switch on-call assignments with a Madison employee because the response time for a former Rockford employee to go deep into Wisconsin on an emergency call would be too great.[120]

Respondent may point to the interchange between the former Rockford employees and the former Madison employees while on the job and their shared supervisor as evidence of an integrated unit. However, interaction between the two groups of employees and shared supervision are not changed circumstances in this case and do not demonstrate any degree of integration.[121] Prior to the relocation to Janesville, the former Rockford employees and the former Madison employees attended trainings together and, albeit infrequently, encountered each other while out in the field for work.[122] Their interaction may have slightly increased due to their reporting to the same Janesville office but there is no evidence of any demonstrable change in

---

[117] Tr. 263-264.

[118] Tr. 147 – 148, 247.

[119] Tr. 128 – 129.

[120] Tr. 129 – 130.

[121] *See Frontier Telephone of Rochester, Inc.*, 344 NLRB 1270, 1272 fn. 10 (2005), *enforced mem.,* 181 Fed. App'x 85 (2d Cir. 2006) (noting that a finding of employee interaction cannot substitute for a finding of employee interchange).

[122] Tr. 113, 130 – 131, 225, 235.

interaction between the two groups.[123] That there has only be a negligible increase in interaction is to be expected given that each group of employees performs their work in the field and is scheduled to come to the facility once weekly, on different days, to pick up parts.[124]

The former Rockford employees and the former Madison employees have historically shared the same supervisor and their continued common supervision serves as further evidence of the continuity of the former Rockford employees' working conditions. Even if the common supervision arose after the transfer to Janesville, it would not weigh in favor of a finding that the two groups constituted a single integrated unit. As the Board noted in *ADT I*, "because the servicemen at issue in this case work out of their homes, have no onsite supervision, and in fact, do not even see their supervisors on a daily basis, we do not accord the absence of separate supervision here the weight it bears in other cases."[125]

The Board's reasoning in *ADT I* concerning the lack of weight accorded to shared supervision also applies to the two groups of employees' post-relocation interaction with the same office staff at the Janesville facility. This is especially since Respondent has failed to demonstrate any significant interaction between the service employees and the office staff.[126] That a common lunch space is available to both groups of employees is also without consequence, especially as the former Rockford employees and the former Madison employees

---

[123] Tr. 140, 143 – 144, 261, 306 - 307.

[124] Tr. 83 – 84, 138 - 139, 219, 256, 259 - 260, 262.

[125] *ADT I*, 355 NLRB at 1389, fn. 2.

[126] Tr. 184 – 186, 302 – 304.

do not report to the Janesville office for their weekly parts pick-up on the same day of the week.[127] Furthermore, both Sissum and Anderson testified that they did not use this space.[128]

In sum, with the Respondent and Union's lengthy bargaining history, the continued application of collective-bargaining agreement to the former Rockford Unit after the relocation to Janesville, and the former Rockford employees' continued dispatch from home to work in the field performing the same job functions in the same geographic area with no significant increase in interaction with the former Madison employees, the former Rockford Unit maintained its separate identity and integrity.

### v.   Respondent failed to meet its burden to establish compelling circumstances

Despite given a full opportunity at the hearing to present witnesses and documentary evidence to demonstrate that compelling circumstances existed to overcome the parties' significant bargaining history, Respondent failed to meet its burden. Respondent argues that the former Rockford employees and former Madison employees shared an overwhelming community of interest because they share the same or similar wage rates and perform the same work out of the same facility under the same supervision and according to the same work pools.[129] There is no dispute that the two groups of employees share the same supervision (as they always have) and perform the same type of work out of the Janesville facility.[130] However, Respondent failed to call any witnesses with direct knowledge of the employees' terms and conditions of employment, including their wage rates or work areas. Despite it being

---

[127] Tr. 138 - 139, 260, 262.

[128] Tr. 193, 308.

[129] Tr. 389 – 290.

[130] Common work duties are also not changed circumstances in the instant case. The two groups of employees have historically performed the same type of work. (Tr. 81, 209, 424 - 425.)

Respondent's burden to demonstrate compelling circumstances, Respondent failed to call a single employee to testify regarding the geographic area in which they work. As such, Respondent is unable to prove that the two groups of employees constituted a single integrated unit at any point in time.

Respondent called only two witnesses: Union organizer, Brad Williams, and Director of Labor Relations, James Nixdorf. Williams offered no testimony regarding the employees' terms and conditions of employment.[131] Nixdorf, based out of Boca Raton, Florida,[132] who is responsible for administering collective-bargaining agreements for approximately 30 bargaining units across the United States, gave only general testimony regarding employee work areas and later admitted to having no independent knowledge of where each technician in the instant case spent their work time (one of the fundamental factors at issue in this case as set forth in *ADT I*).[133] He offered only vague testimony regarding the former Madison employees' wages, one of the most significant terms and conditions of employment.[134]

Significantly, Respondent failed to call the former Rockford employees' and former Madison employees' direct supervisor, Team Manager High Volume Install Matt Ides.[135] Ides supervises the former Rockford employees and former Madison employees, as he did prior to the relocation to Janesville. Ides sees the employees weekly at their parts pick-up and communicates with at least the former Rockford employees daily.[136] He is arguably in the best position to

---

[131] Tr. 390 – 402.

[132] GCX 15 (letterhead showing Boca Raton, Florida address).

[133] Tr. 346, 423 and 441.

[134] Tr. 426.

[135] Tr. 98, 219 - 220.

[136] Tr. 98, 114 - 116, 137, 220, 236 - 238, 259 – 260.

testify regarding the terms and conditions of employment of these two groups, yet Respondent inexplicably failed to call him to the stand.

Any attempts by Respondent to rely on its cross-examination of the former Rockford employee witnesses to establish that there was a change in the geographic area in which they worked post-relocation to Janesville must fail. Former Rockford employee Sissum credibly testified on direct examination that while working at the Rockford facility, he spent the majority of his working time in Rockford and its surrounding areas, and a minimal amount of time working in Wisconsin, and that these working areas did not change after the relocation to Janesville.[137] On cross-examination, he consistently testified that while working out of the Rockford facility, he spent only a small percentage of his typical work week in Wisconsin.[138] His testimony that he now goes to Wisconsin every week hardly establishes a changed geographic work area, as it is undisputed that the former Rockford employees now report to the Janesville, Wisconsin facility every Friday for their scheduled parts pick-up.[139] Former Rockford employee Anderson's testimony on cross-examination that he was unaware of any geographic distinction between where the former Rockford employees and the former Madison employees worked is undercut by his more detailed testimony on direct examination that he works mainly in Illinois, in Rockford or within 20 miles thereof, and that other than the border of Illinois and Wisconsin, he does not work in Wisconsin often and only on an as-needed basis.[140]

Respondent failed to compensate for its lack of relevant testimony through the presentation of compelling documentary evidence. For instance, the weight of Respondent's case

---

[137] Tr. 120, 137.

[138] Tr. 209.

[139] Tr. 138, 209.

[140] Tr. 240 - 242, 308.

at the administrative hearing appeared to be that the former Rockford employees' geographic coverage changed after the relocation to Janesville. Director of Labor Relations Nixdorf, who admitted to having no independent knowledge of where each technician worked, offered only general testimony regarding the former Rockford employees' coverage area.[141] Although Respondent possessed dispatch logs that showed each customer's address and could have easily resolved the question of what geographic area the service employees worked in, Respondent failed to introduce these records into evidence.[142] Respondent identified a document that included information from its Oracle HR system that reflects wage rates for both former Rockford employees and former Madison employees working at the Janesville facility.[143] However, Respondent offered no context for this document, including how the former Madison employees' wages were determined, i.e. by seniority, performance or any other criteria, or how the former Madison employees' job titles, skills, training and experience compared to that of the former Rockford employees. Regardless, any similarity between wages does not detract from the fact that the wage rates for the former Madison employees were determined by Respondent whereas the wage rates received by the former Rockford Unit employees, both prior to and after the relocation to Janesville, were collectively-bargained and contractually derived.

As the record testimony does not establish that the former Rockford employees were absorbed or integrated into a unit including all the employees who work out of the Janesville

---

[141] Tr. 422 - 423, 441.

[142] Tr. 364, 376, 381.

[143] Tr. 425; GCX 33.

facility, Respondent cannot establish compelling circumstances to overcome the parties' lengthy 26-year collective-bargaining relationship.[144]

### vi.       Respondent cannot distinguish the instant case from *ADT I*

The facts in *ADT I* closely parallel the facts in the instant case.[145] In both cases, Respondent withdrew recognition from the union after a lengthy bargaining relationship and where the unit employees maintained separate and distinct identity from the non-unionized group of employees. Respondent attempts to distinguish the facts in the instant case from those in *ADT I* by arguing that the collective-bargaining agreement in *ADT I* contained a work jurisdiction clause, which defined the unit as serving the Kalamazoo territory, and a notification clause, which required that the Union be notified of anyone else working in that territory.[146]

It is undisputed that the collective-bargaining agreement in the instant case does not contain a work jurisdiction clause or a notification clause.[147] However, the absence of these clauses does not take the instant case out of the legal rubric set forth in *ADT I*.[148] The Board's analysis focused on the fact that the Kalamazoo unit employees "continued to perform the same work in the same distinct geographical area under largely unchanged terms and conditions of employment."[149] That the distinct geographic work area for the former Rockford unit employees

---

[144] See *Children's Hosp. of San Francisco*, 312 NLRB at 929 (adopting the administrative law judge's decision and order in which he noted that respondent had not demonstrated "compelling" reason to overcome the significance of bargaining history by, inter alia, failing to support its assertions about employee interchange with records or specific evidence).

[145] *ADT I*, 355 NLRB at 1388.

[146] Tr. 389 – 390, 424

[147] GCX 3.

[148] *ADT I*, 355 NLRB at 1388.

[149] *Id*.

is defined de facto, and not contractually, and that the Union was not notified of others working in the Rockford territory, are not material differences. The Board's legal analysis in *ADT I* is appropriately applied in the instant case.[150]

### D. Respondent unlawfully implemented unilateral changes to the former Rockford employees' terms and conditions of employment post-withdrawal of recognition in violation of Section 8(a)(5) of the Act

It is well-established that an employer's implementation of unilateral changes after an improper withdrawal of recognition are unlawful.[151] As the evidence establishes that Respondent unlawfully withdrew recognition from the Union, it follows that the unilateral changes to the former Rockford employees' terms and conditions of employment, to which Respondent essentially admits, are also unlawful.

---

[150] Respondent may argue that *ADT Security Services*, 368 NLRB No. 118 (referred to herein as *ADT II*) is applicable to the instant case. However, *ADT II* is both factually and legally distinguishable from the instant case. *ADT II* involved Respondent's consolidation with a competitor in the same greater metropolitan area that resulted in significant integration between the groups of employees. This is factually distinguishable from the instant case, in which two groups of employees who continue to work in two geographically distinct and distant service areas now report to one centralized office. *ADT II* is also legally distinguishable as the Board found that the administrative law judge had erroneously approached an accretion issue that is not present in the instant case.

[151] *In Re Scepter Ingot Castings, Inc*., 331 NLRB 1509 (2000), *enforced* 280 F.3d 1053 (D.C. Cir. 2002) (finding the employer's unilateral changes implemented after unlawful withdrawal of recognition violated Section 8(a)(5)); *Texas Petrochemicals Corp.,* 296 NLRB 1057, 1063 (1989), enforced in relevant part and remanded 923 F.2d 398 (5th Cir. 1991), rehearing denied 931 F.2d 892 (5th Cir. 1991) (finding that after unlawfully withdrawing recognition from the union, the respondent violated Section 8(a)(5) and (1) of the Act by unilaterally, without notice to or consultation with the union, converting all bargaining unit employees from hourly to salaried compensation and restructuring their insurance premiums); *Peat Mfg. Co.,* 251 NLRB 1117, 1117 (1980), *enforced.* 673 F.2d 1339 (9th Cir. 1982) (finding that the respondent violated Section 8(a)(5) and (1) of the Act by unilaterally granting benefits to unit employees after unlawfully withdrawing recognition from the union).

Petitioner's Petition for Injunctive Relief[152] Under Section 10(j) of the National Labor Relations Act, As Amended, alleges that in September 2020 [after the unlawful withdrawal of recognition], Respondent made the following unilateral changes:[153]

(1) changed the wages for the Unit;

(2) changed how overtime is earned for the Unit;

(3) changed the manner of in which the Unit accrues and uses paid time off;

(4) made the Unit eligible for its bonus system offered to unrepresented employees; and

(5) made other changes to the Unit employees' terms and conditions of employment that are currently unknown to the Board's General Counsel.

Respondent's Answer and Defenses to Petition for Injunction Under Section 10(j) admits the changes made to wages, overtime, paid time off, and that the Unit was offered a bonus system in September 2020.  Respondent denies making other changes to the Unit employees' terms and conditions of employment.[154]

Based on testimony during the administrative hearing, the consolidated complaint in the administrative proceeding was amended to include additional allegations of unilateral changes, specifically adding that Respondent changed the wages *and method of compensation* for the Unit and *implemented a new performance review system*.[155] Respondent filed an amended answer in the administrative proceeding that acknowledged these changes, but denied that they violated the

---

[152] Petition in Civil Case No. 3-21-cv-9.

[153] Details as to how Respondent changed terms and conditions of employment in these areas are described above in the statement of facts, section II.B.vi.a-e

[154] GCX 1(i).

[155] GCX 1(t).  (Please note that GCX 1(t) and 1(u) appear before GCX 1(a)).

Act.[156] [157] Petitioner requests that any order granting injunction issued by this Court encompass these additional unilateral changes.

### E. Respondent's defenses must fail

Respondent's defense to the allegation that it unlawfully withdrew recognition from the Union rests largely on a May 8, 2020, representation petition that the Union filed with the Board. The petition sought to represent a unit consisting of all service employees working out of the Janesville facility and was promptly withdrawn. Respondent appears to argue that the filing of this petition demonstrated the Union's belief that there existed an integrated unit of former Rockford employees and former Madison employees. By asserting the existence of such an expanded unit, Respondent then relies on a decertification petition signed by only the non-unionized former Madison employees to show that a majority of the former Rockford Unit no longer wished to be represented by the Union and Respondent properly withdrew recognition from the Union.[158] This defense must fail.

### i. The withdrawn representation petition has no bearing on the appropriateness of the already established Rockford Unit

The May 8, 2020, representation petition filed by the Union sought to represent a unit consisting of all service employees working out of the Janesville facility.[159] On May 15, 2020, the Region issued an order approving the Union's request to withdraw the petition.[160] As the

---

[156] GCX 1(u).

[157] Specific details of these changes are described in the statement of facts section, II.B.vi.a-e

[158] Tr. 67 – 69, 152 – 153; GCX 14, 24 – 25.

[159] GCX 12.

[160] GCX 13.

parties did not reach a stipulated election agreement and no election was held, no determination was made by the Board on the appropriateness of the petitioned-for unit.[161]

The Union's brief, and since abandoned, pursuit of a unit that included both the former Rockford employees and the former Madison employees is a red herring and has no bearing on the appropriateness of the already well-established Rockford unit. Section 9(b) of the Act grants the Board authority to determine "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). It is well-established that the Board need only find *an* appropriate unit, not the *most* appropriate unit, and more than one appropriate unit may exist among the same group of employees.[162] As the Board noted in *ADT I:*

> Even absent the 29 year-old bargaining relationship, were the Union now to petition to represent the service employees assigned to southwestern Michigan, the question would not be whether the unit sought was the most appropriate unit, i.e., whether the unit of all servicemen operating out of the Wyoming facility is more appropriate, but merely whether it was an appropriate unit.[163]

---

[161] Tr. 20.

[162] *Overnight Transportation Co*., 322 NLRB 723 (1996) ("The plain language of the Act clearly indicates that the same employees of an employer may be grouped together for purposes of collective bargaining in more than one appropriate unit…it is well-settled that there is more than one way in which employees of a given employer may be appropriately grouped for purposes of collective bargaining."); *Children's Hosp. of San Francisco*, 312 NLRB at 928 ("At the outset, in this regard, it must be noted that Section 9(a) of the Act requires that, in order to be designated as a group of employees' exclusive representative for purposes of collective bargaining, a labor organization must be selected, as such, by a majority of the employees in an appropriate unit and that "there is nothing in the [Act] which requires that the unit for bargaining be the only appropriate unit, or the ultimate unit, or the most appropriate unit; the Act requires only that the unit be "appropriate.'…Also, 'the fact that one unit is appropriate does not necessarily mean that all other units are inappropriate.'") (citations omitted).

[163] *ADT I,* 355 NLRB at 1388.

It is not incongruent for the Union to have petitioned to represent a unit consisting of all service employees out of the Janesville facility while at the same time having maintained the appropriateness of the well-established former Rockford Unit. As such, the filing of that petition has no bearing on this Court's analysis and consideration of the merits of Petitioner's request for injunctive relief.

ii.     **The decertification petition did not privilege Respondent to withdraw recognition from the Union**

The record is clear that no former Rockford Unit employees' signatures appear on the decertification petition that Respondent argues demonstrates the Union's loss of majority support in the Rockford Unit.[164] In order to rely on this defective petition to justify its withdrawal of recognition from the Union, Respondent attempts to improperly expand the former Rockford Unit to include the former Madison employees. As there is no evidence that Respondent recognized the Union as the collective-bargaining representative of the former Madison employees at any time, nor that the former Rockford employees and former Madison employees were integrated into a single unit as described above in paragraph II.C.iv., Respondent's ruse must fail.

The evidence is clear that Respondent never considered the Union to be the collective-bargaining representative of the former Madison employees nor did it consider the former Madison employees to be part of the Rockford Unit. At the time the former Madison employees joined the former Rockford Unit employees at the Janesville facility the former Rockford employees outnumbered the former Madison employees and were the majority.[165] Respondent never applied the collective-bargaining agreement to the former Madison employees, nor did it

---

[164] Tr. 67 – 69, 152 – 153.

[165] Tr. 103 – 104, 444 – 445.

notify the Union of any new hires into the bargaining unit or remit dues to the Union on behalf of any new employees or former Madison employees.[166] Furthermore, there is no evidence that the Union claimed to represent the former Madison employees at any time before or after the relocation to Janesville.

Respondent's Director of Labor Relations, Nixdorf, admitted on cross-examination that Respondent did not consider all the service employees at the Janesville facility to be represented by the Union. He further admitted that Respondent's actions with respect to the Union demonstrated it did not believe the Union represented all the service employees at the Janesville facility.[167] Respondent's reliance on the decertification petition signed only by non-Unit employees to withdraw recognition from the Union was self-serving, disingenuous and unlawful.

### iii.   The Board's decision in *Johnson Controls, Inc.*, is inapposite to the instant case

Respondent ADT will likely argue that the Board's decision in *Johnson Controls, Inc.*,[168] required the Union to file a petition to re-establish its majority status after receiving the notification of the anticipated withdrawal of recognition. This would be a baseless argument, as *Johnson Controls* is inapposite to the instant case.

*Johnson Controls* addresses the situation where employees provide an employer with evidence that at least 50% of bargaining unit employees no longer wish to be represented by the union and the union reacquires majority status after the employer's anticipated withdrawal of recognition. The Board held that proof of an incumbent union's actual loss of majority support, if received by an employer within 90 days prior to contract expiration, conclusively rebuts the

---

[166] Tr. 58, 444.

[167] Tr. 443 – 444.

[168] *Johnson Controls, Inc.*, 368 NLRB No. 20 (2019).

union's presumptive majority status when the contract expires. However, the union may attempt to reestablish that status by filing a petition for a Board election within 45 days from the date the employer gives notice of an anticipatory withdrawal of recognition.[169]

*Johnson Controls* did not consider the issue at hand in the instant case, which is whether a specific bargaining unit is still a valid unit after a facility relocation. Here, the issue is whether Respondent improperly expanded the bargaining unit so that it could rely on non-Unit employees' signatures on the decertification petition in order to unlawfully withdraw recognition from the Union. None of the former Rockford Unit employees signed the petition. Respondent withdrew recognition from the Union when it did not have valid evidence that at least 50% of the established former Rockford Unit no longer wished to be represented by the Union. Anticipatory withdrawal law under *Johnson Controls* is immaterial here because the purported evidence of loss of support did not come from the existing bargaining unit.[170]

In short, as shown above, the former Rockford Unit maintained its integrity after the facility relocation to Janesville and Respondent has failed to meet its burden of demonstrating compelling circumstances overcoming the parties' significant bargaining history. As its other defenses are without merit, Petitioner has demonstrated a very strong likelihood of success of prevailing on the merits in the administrative proceeding.[171]

---

[169] *Johnson Controls, Inc.*, 368 NLRB No. 20.

[170] Nor does *Dodge of Naperville, Inc.*, 357 NLRB 2252, 2253 (2012), *enforced,* 796 F.3d 31 (D.C. Cir. 2015) as Respondent may argue, apply to the instant case. *Dodge of Naperville* concerned a failure to engage in effects bargaining before a unit merger, which is not at issue here.  Even so, the Board in that case cited to the "compelling circumstances" test set forth in *ADT I*, while cautioning that bargaining history alone is insufficient to establish an appropriate unit.

[171] *See Glasser ex rel. N.L.R.B.,* 379 F. App'x at 489.

III. **INTERIM RELIEF IS EQUITABLY NECESSARY TO PREVENT IRREPARABLE HARM TO THE EMPLOYEES' STATUTORY RIGHTS AND TO PROTECT THE EFFEICACY OF THE BOARD'S FINAL ORDER**

"[I]n the labor field, as in few others, time is crucially important in obtaining relief."[172] Respondent's illegal conduct threatens irreparable harm to the national labor policy encouraging good-faith collective bargaining embodied in Section 1 of the Act, obliterates the employees' right to organize under Section 7 of the Act, and threatens the efficacy of the Board's ultimate remedial order.

"[E]ncouraging the practice and procedure of collective bargaining" is "the policy of the United States[.]"[173] Section 7 of the Act grants employees the right to decide whether they wish "to bargain collectively through representatives of their own choosing . . . ."[174] In this case, the employees exercised that right and freely selected their representative, but Respondent's unlawful actions are thwarting that choice, contrary to the purposes of the Act. As explained below, without timely interim relief, Respondent's withdrawal of recognition and unilateral changes will undermine employees' support for the Union and deprive employees of the benefits of collective bargaining. In this case, Respondent's unilateral grant of significant bonuses to the former Rockford Unit cannot but provoke disaffection from the Union. Over time, without an immediate injunction requiring interim recognition, good-faith bargaining, and rescission of the changes, these harms will be irreparable, and the Board's final remedial bargaining order will be ineffective. Respondent will succeed in permanently depriving its employees of Union representation through its illegal conduct, contrary to the Act's intent.

---

[172] *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430 (1967).

[173] 29 U.S.C. § 151.

[174] 29 U.S.C. § 157.

Respondent's withdrawal of recognition is likely to irreparably erode employees' support for their chosen representative over time because the Union is unable to protect the employees or affect their working conditions while the case is pending before the Board.[175] The employees predictably will shun the Union because their working conditions will have been virtually unaffected by collective bargaining for several years, and they will have little, if any, reason to support the Union.[176] This lost support for the Union will not be restored by a final Board order in due course. By the time the Board issues its final order, it will be too late; employees will have given up on their union.[177]

---

[175] *See Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 49-50 (1987) (employer's refusal to bargain "'disrupts the employees' morale, deters their organizational activities, and discourages their membership in unions.'") (quoting *Franks Bros. Co. v. NLRB*, 321 U.S. 702, 704 (1944)). *Cf. NLRB v. American Natl. Ins. Co.*, 343 U.S. 395, 402 (1952) ("Enforcement of the obligation to bargain collectively is crucial to the statutory scheme."); *NLRB v. Keystone Steel & Wire*, 653 F.2d 304, 307 (7th Cir. 1981) (when an employer unlawfully ignores the bargaining representative, it impairs "the stability of the bargaining relationship" and "create[s] perceptions of unfairness and of union weakness").

[176] *See Bloedorn*, 276 F.3d at 297-98; *Asseo v. Centro Medico del Turabo, Inc.*, 900 F.2d 445, 454-55 (1st Cir. 1990); *Hoffman v. Inn Credible Caterers, Ltd.*.247 F.3d 360.369 (2d Cir. 2001); *Chester v. Grane Healthcare Co.*, 666 F.3d 87, 102 (3d Cir. 2011) (refusal to recognize union "inflicts a particularly potent wound"); *Frye v. Specialty Envelope, Inc.*, 10 F.3d 1221, 1226-27 (6th Cir. 1993); *Frankl v. HTH Corp.*, 650 F.3d 1334, 1362 (9th Cir. 2011) ("the result of an unremedied refusal to bargain with a union, standing alone, is to discredit the organization in the eyes of the employees, to drive them to a second choice, or to persuade them to abandon collective bargaining altogether"); *NLRB v. Irving Ready-Mix, Inc.*, 780 F. Supp. 2d 747, 771 (N.D. Ind. 2011) ("The longer that [the employer] is able to avoid bargaining with the [u]nion, the less likely the [u]nion will be able to organize and represent [the employer's] employees effectively if and when the Board orders [it] to commence bargaining."), *affirmed sub nom. Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566 (7th Cir. 2011).

[177] *See Bloedorn*, 276 F.3d at 299; *Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1192 (9th Cir. 2011) ("delay in bargaining weakens support for the union, and a Board order cannot remedy this diminished level of support"); *Hoffman*, 247 F.3d at 369 (since employers "can damage employee confidence in

The Union's loss of support, in turn, will make the Board's final bargaining order

ineffectual, leading to remedial failure.[178] The Union needs the support of the employees it

represents in order to bargain effectively. Without support, the Union has no leverage and is

"hard-pressed to secure improvements in wages and benefits at the bargaining table."[179] With a

weakened union, a final Board bargaining remedy will be unable to "recreate the original status

---

preexisting unions by simply failing to recognize them . . . there is a pressing need to preserve the status quo while the Board's final decision is pending."); *Electrical Workers v. NLRB*, 426 F.2d 1243, 1249 (D.C. Cir. 1970) ("When the company is finally ordered to bargain with the union some years later, the union may find that it represents only a small fraction of the employees."); *Centro Medico*, 900 F.2d at 454-55 ("there was a very real danger that if [the employer] continued to withhold recognition from the [u]nion, employee support would erode to such an extent that the [u]nion could no longer represent those employees"); *Squillacote v. U.S. Marine Corp.*, 1984 WL 148024, at *4 (E.D. Wis. 1984).

[178] *See Bloedorn*, 276 F.3d at 299 (the longer a union "is kept . . . from working on behalf of . . . employees, the less likely it is to be able to organize and represent those employees effectively if and when the Board orders the company to commence bargaining"); *Chester*, 666 F.3d at 102–103 (interim bargaining order necessary because "[a]n ultimate Board order that [the employer] recognize the Union may be ineffective if the Union has lost significant support"); *Small*, 661 F.3d at 1193 ("[w]ith only limited support . . . the [u]nion will be unable to bargain effectively regardless of the ultimate relief granted by the Board"); *Irving Ready-Mix*, 780 F.Supp.2d at 771–772; *Kinney v. Cook Cnty. Sch. Bus, Inc.*, 2000 WL 748121 at *8–11 (N.D. Ill. 2000).

[179] *Moore-Duncan v. Horizon House Developmental Servs.*, 155 F. Supp. 2d 390, 396 (E.D. Pa. 2001). *See also Duffy Tool & Stamping, L.L.C. v. NLRB*, 233 F.3d 995, 998 (7th Cir. 2000) ("By undermining support for the union, the employer positions himself to stiffen his demands . . . knowing that if the process breaks down the union may be unable to muster enough votes to call a strike."); *Hadsall v. Sunbelt Rentals Inc.*, 2020 WL 4569177, at *5 (E.D. Wis. 2020) ("it is widely accepted that the longer the employer avoids bargaining with the union, the more likely it is that participation in the union will be chilled and that the union will not be able to be effective in its representation"), *appeal pending* 7th Cir. No. 20-2482.

quo with the same relative position of the bargaining parties."[180] In those circumstances, no meaningful, productive good-faith bargaining will occur under the Board's final order.[181] For these reasons, numerous courts, including the Seventh Circuit, have recognized that an employer's unlawful refusal to bargain inherently and predictably causes irreparable harm.[182]

---

[180] *Frankl*, 650 F.3d at 1363. *See also Wilson v. Liberty Homes, Inc.*, 500 F. Supp. 1120, 1131 (W.D. Wis. 1980) (interim bargaining order warranted because "in the time it takes for the Board to finally rule . . . support among the truck drivers for the union may have eroded; erosion of support for the union in turn may unfairly diminish the union's bargaining strength if and when respondent is compelled to bargain with it"), *aff'd in rel. part* 1981 WL 17037, at *13-14 (7th Cir. 1981), *vacated as moot and opinion withdrawn from publication as moot*, 1982 WL 31231 (7th Cir. 1982).

[181] *See Electrical Workers*, 426 F.2d at 1249 (employer "may continue to enjoy lower labor expenses after the order to bargain either because the union is gone or because it is too weak to bargain effectively"); *Perez v. Noah's Ark Processors, LLC,* 2019 WL 2076793 at *5 (D. Neb. 2019) ("the Board's ultimate remedial action is likely to have little effect if it only results in compelling [the employer] to engage in collective bargaining with a Union that's already lost its base of support").

[182] *See Bloedorn*, 276 F.3d at 297-98 (Director not required to produce independent evidence of irreparable harm where employer refused to recognize union because "the same evidence that establishes the Director's likelihood of proving a violation of the NLRA may provide evidentiary support for a finding of irreparable harm"); *Frankl*, 650 F.3d at 1362 (withdrawal of recognition context; "inferences from the nature of the particular unfair labor practice at issue remain available. For instance, with regard to the central statutory violations likely established here, violations of § 8(a)(5), continuation of that unfair labor practice, failure to bargain in good faith, has long been understood as likely causing an irreparable injury to union representation"); *Small*, 661 F.3d at 1191 ("Given the central importance of collective bargaining to the cause of industrial peace, when the Director establishes a likelihood of success on a failure to bargain in good faith claim, that failure to bargain will likely cause a myriad of irreparable harms."); *U.S. Marine*, 1984 WL 148024, at *4 (irreparable harm inferred where employer unlawfully refused to recognize and bargain with the union).

Respondent will defeat the Union, elude its bargaining obligation, and frustrate the intent of Congress by virtue of its unlawful actions.[183]

Ordering Respondent to bargain with the Union now offers the best chance of preserving the Union's support before it is irrevocably diminished, thereby protecting employees' statutory right to choose representation and preserving the Board's remedial effectiveness.[184]

Loss of support for the Union is not the only irreparable harm caused by Respondent's refusal to bargain in good faith. While Respondent is benefiting from its unlawful refusal to recognize or bargain pending Board litigation, the unit employees contemporaneously and irreparably suffer the loss of the benefits of good-faith collective bargaining and representation by their chosen Union.[185] The benefits of collective bargaining include negotiated improvements in terms and conditions of employment, such as scheduled wage increases or benefits packages. A final Board order is "forward-looking" and will not compensate for the benefits that the Union might have secured through bargaining in the present.[186] The lost benefits of representation also go beyond wages to include such items as job security, safety and health conditions, and the protection of a grievance-arbitration procedure which, because they are non-monetary, cannot be

---

[183] *See Sharp v. Tri-State Mechanical, Inc.,* 1995 WL 661101, at *7 (W.D. Wis. 1995) ("[I]t is proper to impose a bargaining order. Anything less would only allow respondent 'to profit from [his] own wrongful refusal to bargain.'") (quoting *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610 (1969)).

[184] *Scott v. Stephen Dunn*, 241 F.3d 652, 669 (9th Cir. 2001) ("[s]uccessful bargaining could restore the employees' interest in the Union").

[185] *See Wilson*, 500 F. Supp. at 1131 ("the longer respondent is permitted avoid negotiating with the union, the longer the truck drivers will be denied the benefits of a potential collective bargaining agreement. This is an especially important consideration since the benefits the drivers seek are not economic only, but also concern the safety of their working conditions.").

[186] *See Bloedorn,* 276 F.3d at 299; *Small*, 661 F.3d at 1191-92; *Frankl*, 650 F.3d at 1363; *Chester*, 666 F.3d at 103.

made whole by a Board order in due course.[187] The employees are currently suffering the loss of all of these benefits. In addition to Respondent's unilateral changes to wages and benefits, employees have lost their contractual just-cause grievance procedure, Union representation in disciplinary meetings, and any say in Respondent's changes in the terms and conditions of employment. Moreover, the refusal to recognize and bargain has potentially delayed any successor contract.

In contrast to these serious irreparable harms to the employees' rights, the Union's status, and the Board's remedial authority, any harm Respondent might suffer as a result of a temporary injunction "will only last until the Board's final determination."[188] An interim bargaining order under Section 10(j) is not permanent.[189] The order would not compel agreement to any specific term or condition of employment advanced by the Union in negotiations.[190] Rather, it only

---

[187] *See U.S. Marine*, 1984 WL 148024, at *4 (citing *Wilson*, 500 F. Supp. at 1131); *Pascarell v. Gitano Group, Inc.*, 730 F. Supp. 616, 625 (D.N.J. 1990); *Asseo v. Centro Medico del Turabo, Inc.*, 1989 WL 130007, at *9 (D.P.R. 1989) ("employees will also lose the benefits of representation, such as health and safety advocacy and grievance representation, which cannot be compensated by a final Board order"), *aff'd*, *Centro Medico* 900 F.2d 445; *Levine v. C & W Mining Co.*, 465 F. Supp. 690, 695 (N.D. Ohio), *aff'd in rel. part* 610 F.2d 432, 436-37 (6th Cir. 1979) ("The value of the right to enjoy the benefits of union representation is immeasurable in dollar terms once it is delayed or lost."); *DeProspero v. House of the Good Samaritan*, 474 F. Supp. 552, 559 (N.D.N.Y. l978). *See generally Scott*, 241 F.3d at 667 ("The value of the right to . . . representation is immeasurable in dollar terms").

[188] *Pan Am. Grain Co.*, 805 F.2d 23, 28 (1st Cir. 1986).

[189] *See Seeler v. The Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975) ("there is nothing permanent about any bargaining order . . . particularly an interim order which will last only until the final Board decision"); *U.S. Marine*, 1984 WL 148024, at *4.

[190] *See Wilson*, 500 F. Supp. at 1131 ("[S]ince a bargaining order requires only that respondent bargain, and not that it reach any particular agreement, respondent will not suffer any irreparable harm from such an order.")

requires bargaining with the Union in good faith to an agreement or a bona fide impasse.[191] Any agreement reached between the parties under a Section 10(j) decree can contain a condition subsequent to take into account the possibility of the Board's ultimate refusal to grant a final bargaining order remedy.[192] Also, the costs in terms of time and money spent on collective bargaining are burdens that fall on both parties and do not defeat a request for an interim bargaining order.[193] Additionally, the strength of the Board's case on the merits affects a court's assessment of the relative harms posed by the grant or denial of injunctive relief: the greater a party's prospects of prevailing on the merits, the less compelling a showing of irreparable harm is required.[194] Accordingly, the balance of hardships tips in the Director's favor.

An interim bargaining order will also further the public interest in fostering collective-bargaining to safeguard industrial peace.[195] Additionally, it will serve the public interest in "ensur[ing] that an unfair labor practice will not succeed" because of the long administrative process.[196]

---

[191] *See Frankl*, 650 F.3d at 1048 ("When the company is not compelled to do anything except bargain in good faith, the risk from a bargaining order is minimal." (quoting *Small*, 661 F.3d at 1196)); *Scott*, 241 F.3d at 669; *Overstreet v. Thomas Davis Medical Centers, P.C.*, 9 F. Supp. 2d 1162, 1167 (D. Ariz. 1997); *Penello v. United Mine Workers*, 88 F. Supp. 935, 943 (D.D.C. 1950).

[192] *See*, *e.g.*, *Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1054 (2d Cir. 1980).

[193] *See Scott*, 241 F.3d at 669.

[194] *Spurlino Materials, LLC*, 546 F.3d at 502 (citing *Bloedorn*, 276 F.3d at 286-87).

[195] *See Bloedorn*, 276 F.3d at 300-01; *Centro Medico*, 900 F.2d at 455 ("If the goal of the labor laws and regulations is to strengthen the bargaining process, then ordering bargaining . . . cannot be contrary to the public interest."). *See also Paulsen v. Remington Lodging & Hospitality, LLC*, 773 F.3d 462, 469 (2d Cir. 2014) ("The principal purpose of a [Section] 10(j) injunction is to guard against harm to the collective bargaining rights of employees.").

[196] *Small*, 661 F.3d at 1197 (quoting *Frankl*, 650 F.3d at 1365-66). *See also Bloedorn*, 276 F.3d at 300 (citing *Eisenberg v. Wellington Hall Nursing Home, Inc.*, 651 F.2d 902, 906-07 (3d Cir. 1981)); *Harrell*,

In addition to an interim bargaining order, interim rescission of Respondent's unlawful changes in working conditions is necessary to restore an "even playing field" for bargaining.[197] Restoring the unlawfully changed conditions so that the Union will not be forced to "bargain back" the unlawful changes prevents Respondent from benefitting from its unfair bargaining advantage.[198] Unilateral changes necessarily frustrate the statutory objective of establishing working conditions through collective bargaining.[199] Also, interim rescission is necessary to curb the predictable loss of employee support for the Union caused by the adverse unilateral changes in critical terms and conditions, damage that an eventual Board order likely cannot remedy.[200]

---

714 F.3d at 557; *Seeler*, 517 F.2d at 39 (the public interest is in "prevent[ing] frustration of the purposes of the Act").

[197] *See Harrell*, 714 F.3d at 557-59; *Squillacote v. Advertisers Mfg. Co.*, 677 F.2d 544, 547 (7th Cir. 1982). *See also Kreisberg v. Healthbridge Mgmt., LLC*, 732 F.3d 131, 143 (2d Cir. 2013), *cert. denied* 135 S. Ct. 869 (2014); *Morio v. N. Am. Soccer League*, 632 F.2d 217, 218 (2d Cir. 1980) (per curiam); *Silverman v. Major League Baseball*, 880 F. Supp. 246, 259 (S.D.N.Y. 1995) (Sotomayor, J.), *aff'd*, 67 F.3d 1054 (2d Cir. 1995). Interim rescission would be upon the request of the Union. *See, e.g.*, *Morio*, 632 F.2d at 640. *See generally Children's Hosp. of San Francisco*, 312 NLRB at 931.

[198] *See Harrell*, 714 F.3d at 558; *Kreisberg*, 732 F.3d at 143 (interim rescission of unilateral changes was necessary to avoid bargaining "in the shadow of work conditions unilaterally imposed" by the employer); *Silverman*, 880 F. Supp. at 259 (interim rescission of unilateral changes appropriate to "salvage some of the important bargaining equality that existed" prior to violations); *Florida-Texas Freight*, 203 NLRB 509, 510 (1973), *enforced*, 489 F.2d 1275 (6th Cir. 1974).

[199] *NLRB v. Katz*, 369 U.S. 736, 747 (1962); *see also Harrell*, 714 F.3d at 557 ("unilateral changes prevent the [u]nion from discussing terms, and therefore 'strike at the heart of the [u]nion's ability to effectively represent the unit employees'").

[200] *See NLRB v. Keystone Steel & Wire,* 653 F.2d at 307 (unlawful unilateral changes "create perceptions of . . . union weakness"); *NLRB v. Hardesty Co.*, 308 F.3d 859, 865 (8th Cir. 2002) ("unilateral action will . . . often send the message to the employees that their union is ineffectual, impotent, and unable to effectively represent them"); *East Bay Automotive Council v. NLRB*, 483 F.3d 628, 634 (9th Cir. 2007) (a unilateral change "minimizes the influence of organized bargaining" and emphasizes to employees "that

The other requested relief is also just and proper. A cease-and-desist order is a standard provision in any Section 10(j) preliminary injunction; it is necessary to restrain Respondent from engaging in future unlawful conduct and assures employees that their rights will be protected.[201] Reading of the Court's order in front of the employees and a representative of the Board is an "effective but *moderate* way to let in a warming wind of information and, more important, reassurance."[202] Relatedly, posting the order during the pendency of the administrative proceedings will further inform and reassure employees of their rights.[203]

---

there is no necessity for a collective bargaining agent") (quoting *May Dep't Stores Co. v. NLRB*, 326 U.S. 376, 385 (1945)); *Gottschalk v. Piggly Wiggly Midwest, LLC*, 861 F. Supp. 2d 962, 972 (E.D. Wis., 2012).

[201] *Paulsen v. PrimeFlight Aviation Servs., Inc.*, 718 F. App'x 42, 45 (2d Cir. 2017) (summary order); *see also, e.g.*, *Hooks v. Ozburn-Hessey Logistics, LLC*, 775 F. Supp. 2d 1029, 1052 (W.D. Tenn. 2011) (cease-and-desist order appropriate "to prevent irreparable chilling of support for the Union among employees and to protect the NLRB's remedial powers.").

[202] *United Nurses Assocs. of Cal. v. NLRB*, 871 F.3d 767, 788-89 (9th Cir. 2017); *see also Hadsall*, 2020 WL 4569177, at *12; *Norelli v. HTH Corp.*, 699 F. Supp. 2d 1176, 1206-07 (D. Haw. 2010) (ordering reading of court order), *aff'd*, 650 F.3d 1334 (9th Cir. 2011); *Fernbach v. Sprain Brook Manor Rehab, LLC*, 91 F. Supp. 3d 531, 550 (S.D.N.Y. 2015); *Rubin v. Vista del Sol Health Services, Inc.*, 2015 WL 306292, at *2 (C.D. Cal. Jan. 22, 2015); *Overstreet v. One Call Locators Ltd.*, 46 F. Supp. 3d 918, 932 (D. Ariz. 2014); *Calatrello v. Gen. Die Casters, Inc.*, 2011 WL 446685, at *8 (N.D. Ohio Jan. 11, 2011).

[203] *See, e.g.*, *Hadsall*, 2020 WL 4569177, at *12; *Hooks*, 775 F. Supp. 2d at 1054 (ordering posting).

## **CONCLUSION**

In sum, interim relief ensures that Respondent does not profit from its illegal conduct, protects employees' Section 7 rights, safeguards the parties' collective bargaining process, preserves the remedial power of the Board, and effectuates the will of Congress.

Dated: February 12, 2021.

Respectfully submitted,

/s/ Tabitha E. Boerschinger
New York Bar No.: 4070181
Attorney for Petitioner
National Labor Relations Board, Region 18
310 W. Wisconsin Avenue, Suite 450W
Milwaukee, Wisconsin 53203
Telephone: (414) 930-7193
Fax: (414) 297-3880
E-Mail: tabitha.boerschinger@nlrb.gov

/s/ David J. Stolzberg
New York Bar No.: 4988747
Attorney for Petitioner
National Labor Relations Board, Region 18
212 3rd Avenue S, Suite 200
Minneapolis, Minnesota 55401
Telephone: (763) 270-7057
Fax: (612) 348-1785
E-Mail: david.stolzberg@nlrb.gov