## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

JENNIFER A. HADSALL, Regional Director
of Region 18 of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

      Petitioner,

v.                                                                  Case No.  3:21-cv-00009-JDP

ADT, LLC,

      Respondent.

## RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO PRELIMINARY INJUNCTION UNDER SECTION 10(j) OF THE NLRA

Respondent ADT, LLC ("ADT" or "the Company"), by its attorneys OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C., respectfully asserts that injunctive relief should be denied in this matter.  As fully discussed below, the Petitioner has failed to carry its burdens of proof of likelihood of success on the merits that traditional remedies will not suffice, that public harm will result absent an injunction, that irreparable harm will occur absent the injunction, and that the harm to be prevented outweighs any irreparable harm to ADT resulting from the granting of an injunction.

Therefore, injunctive relief should be denied and this matter dismissed with prejudice.

## PERTINENT FACTS

**I.    The Union's Certification and Subsequent Bargaining History.**

In 1994, International Brotherhood of Teamsters, Local 364 ("the Union") won a representation election involving Company employees working out of a Rockford, Illinois office. (GCX 2).[1]  The Board certified the Union as the exclusive bargaining representative for the following unit:

> All full-time and regular part-time installers, technicians and service personnel employed by the Employer ***at its 510 LaFayette Avenue, Rockford, Illinois facility***; but excluding all other office clerical employees, professional employees, guards and supervisors as defined by the Act, and all other employees.

(emphasis added). The Union's certification as representative, therefore, is expressly and explicitly linked to the presence of a physical facility in Rockford, Illinois.

Subsequently, the Company and the Union agreed to a series of successive collective bargaining agreements. (GCX 3-10). The most recent and final collective bargaining agreement was effective by its terms from September 1, 2017 through August 31, 2020. (GCX 3). This agreement and each of its predecessors includes a "recognition clause" reflecting the original certification. (GCX 3) ("The Employer hereby recognizes the Union as the exclusive collective bargaining representative . . . for whom the Union was certified by the National Labor Relations Board on October 24, 1994 in Case # 33-RC-3943.").  All relevant "bargaining history" ties directly back to the original certification and its focus on the Rockford facility. (GCX 3-10).

Significantly, and despite many cycles of negotiations, the parties never opted to define the bargaining unit in any terms other than those employed at the Rockford facility. (*See, e.g.,* GCX 3). The contractual relationship is utterly devoid of any bargaining unit definition related to

---

[1] General Counsel exhibits will be identified as "(GCX __)", the Company's exhibits will be identified as "(RX_)" and citations to the unfair labor practice hearing transcript will be identified as "(Tr. __)."

"geographic area" or "exclusive work jurisdiction." (GCX 3-10). The contract history likewise never defines the bargaining unit in terms of specialized work performed or any other criteria beyond the physical Rockford office. (GCX 3-10).

In this proceeding, the Regional Director asks the Court to refashion the certification/contract history from "whole cloth" and with total disregard for bargaining history. *(*Petitioner's (Proposed) Findings of Fact and Conclusions of Law (Dkt. 3), p. 4, item 1(g)).

## II.    Servicing of Northern Illinois Following the Certification.

Due to this bargaining history, the "Rockford unit" was not the only employee group working in the "Rockford area" over multiple decades. (Tr. 72-3). The Rockford group, likewise, has never been limited or confined to work in the Rockford area, the State of Illinois or any other region.  Multiple witnesses consistently confirmed these inescapable facts.

Union Assistant Business Manager Larry Rowlett ("Rowlett") explained, "The way ADT works, there is times where, you know, the ***Chicago*** office might come to the ***Rockford*** jurisdiction on occasion. Our ***Rockford*** group might go into ***Madison*** area and do the same for the ***Madison*** ADT unit." (Tr. 72-3) (emphasis added).  Former Rockford technician Danny Sissum ("Sissum") acknowledged he "might get sent to ***Iowa***" and "might get sent to ***Beloit, Wisconsin***." (Tr. 120) (emphasis added). Former Rockford technician David Anderson ("Anderson") described working "wherever I was required" including multiple sites in Wisconsin such as "***Janesville***, ***Madison***, ***Fond du Lac***, ***Fort Atkinson***." (Tr. 242)(emphasis added). Anderson further testified:

Q.    And at that time [when both Rockford and Madison offices were open] there were no defined territorial boundaries, were there?

A.    There are—***no***.

Q.    And there are still no territorial boundaries today, are there?

A.    No. ***There are no lines***.

3

Q.    You could end up in Wisconsin some days, right?

A.    _Yes_.

Q.    And the Madison folks could end up – the former Madison folks could end up in Illinois?

A.    If certified [licensed],[2] _yes_.

(Tr. 301)(emphasis added). Company witness James Nixdorf likewise confirmed the absence of jurisdictional or geographic boundaries as well as the substantial overlap between multiple employee groups (Rockford, Madison, Chicago, _etc_.). (Tr. 422-4).

## III.    Pre-Merger Operations.

For many years leading up to the pertinent events, the Company maintained two (2) separate brick-and-mortar operations in Rockford, Illinois and Madison, Wisconsin. (Tr. 114). Each facility contained its own accommodations for service and support personnel. (Tr. 183). Rockford housed its own, separate parts storage and clerical/support staff offices. (Tr. 183).  The Madison facility, likewise, contained its own parts and office spaces. (Tr. 183).  While the Union represented employees at the Rockford location, the Madison Facility was non-union. (Tr. 393-5).

## IV.    The Union's Normal Operations.

By its own admission, the Union's normal "coverage area" does not extend into Wisconsin. (Tr. 39).  Instead, the Union services nine (9) northwest Illinois counties (including Winnebago, Stephenson, Jo Daviess, Carroll, Lee, Whiteside and DeKalb). (Tr. 39). Janesville, Wisconsin, therefore, stands "out of [the union's] area" of standard operations. (Tr. 56).

---

[2] The state of Illinois requires a certification for technicians to operate in the state.  Former Madison Facility employees had such certifications so that they could operate beyond the scope of Wisconsin.

V.      **The Company  Relocates/Consolidates for Lawful, Legitimate Business Reasons.**

In February 2019, the Company's real estate department examined the potential consolidation of the Rockford and Madison locations into a new facility located in Janesville, Wisconsin. (RX 5).  Janesville represents the "half way point" between the two legacy Company offices. (RX 5).  In addition to substantial savings and efficiency gains, the new Janesville office allowed the Company to "easily be able to service all zip codes from a central location." (RX 5, p. 1; Tr. 408).

The Company announced the move in a May 22, 2019, communication to all Rockford and Madison personnel (both technicians and sales/support staff). (GCX 11).  On July 23, 2019, the Company sent a second memorandum to all Rockford and Madison personnel regarding the impending Janesville relocation/consolidation. (RX 3).

There is no claim (or even suggestion) that the Janesville consolidation was unlawful or otherwise improper. There is no claim (or even suggestion) that the move had anything to do with the Union, unions generally or any considerations other than legitimate business efficiencies.

Significantly, the Union never demanded or requested "effects bargaining" over the closure of Rockford or the move to Janesville. (Tr. 71-2; 413-5). Had the Union done so, the Company stood ready and willing to fulfill any and all bargaining obligations. (Tr. 413-5; 417).

VI.     **The Rockford Facility Closes and Employees Move to Janesville.**

The Janesville operation did not become fully-operational or fully-staffed overnight. Rather, the move to Janesville involved a transition period.

In approximately September 2019, the Rockford facility permanently closed and its personnel relocated to a temporary Janesville location. (Tr. 75).  Five (5) Rockford technicians and

certain support staff worked out of the temporary facility until approximately the start of 2020. (Tr. 101).  The Madison office remained operational during this period.

At the beginning of 2020, the permanent Janesville location opened and those relocating from Madison (both service technicians and support personnel) joined those who had been working from the temporary space. (Tr. 103).

## VII.   The Rockford and Madison Groups Fully Integrate into Janesville.

Once the permanent Janesville facility opened, the former Rockford and Madison service technicians worked from the same location, performed the same work, engaged with the same support team, and answered to an identical supervisory chain-of-command. (Tr. 73-4, 81, 117, 123, 192-3, 201). Not surprisingly, the new Janesville facility became the hub (pre-pandemic) for any employee workplace discussions regarding discipline, pay disputes or operations. (Tr. 202, 290-1).

Despite the government's substantial efforts to obfuscate the facts, the former Rockford witnesses admitted that they saw and interacted with the former Madison group "more regularly" and at an "increased" level once both groups arrived in Janesville. (Tr. 140, 307).  The two formerly separate groups performed identical work, drove the same trucks, used the same tools/equipment and reported to the same managers. (Tr. 307).  They held themselves out to the public with the same uniforms as a single unit. (Tr. 311).  And, of course, they continued to work without regard to any artificial or imagined geographic boundary or jurisdiction. (Tr. 307).

The "face-to-face" interaction between the Madison and Rockford groups also spiked once the Janesville facility opened. The technicians attended the same "welcome breakfast" with other support personnel in early 2020. (Tr. 143-4).  The two formerly separate groups attended "live" training sessions together, in the same room. (Tr. 143-4).  All former Madison and Rockford

employees physically attended new product sessions together in Janesville. (Tr. 144).  In short, all operational and social gatherings of any sort (for both technicians and support staff) became fully integrated upon Janesville's opening. (Tr. 199).

On this point, the government disingenuously argues that the former Rockford and Madison groups only "had about two in-person training sessions at the new facility."  (Petitioner's Memorandum of Law in Support of its Petition for Preliminary Injunction Under Section 10(j) of the Act (Dkt. 14), p. 12) . As an evidentiary matter, this assertion fails on the record. As a practical matter, the government's argument attempts to use the Covid-19 pandemic to detract from the clear integration of the Rockford and Madison groups. The government's own witnesses confirmed that the increased "face-to-face" interactions between the two (2) groups stalled solely because the Janesville facility "has pretty much been closed since the virus began." (Tr. 145). Even after the pandemic began, however, all Janesville service technicians (both former Rockford and Madison) operated as a single integrated group performing identical functions.  Upon the "shift to virtual," both groups continued to attend the same meetings as one entity. (Tr. 304).  But for the virus, the government's "Rockford" witnesses would expect workplace matters to be discussed in Janesville and further admitted that the "ex-Madison technicians" share the same expectation. (Tr. 309).

## VIII.   The Union Seeks to Represent All Janesville Technicians.

On May 8, 2020, the Union filed a representation petition with Region 18 of the NLRB. (GCX 12).  The petition sought a "wall-to-wall" Janesville unit including all "service technicians, lead install technicians, lead service technicians, service technician trainees [and] install technician trainees" working out of Janesville. (GCX 12).  The total "number of employees" sought by the Union amounted to eleven (11), only five (5) of whom formerly worked from Rockford. (GCX

12). The petition signed by the Union notes: "Willful false statements on this petition can by punished by fine and imprisonment." (GCX 12).

When a union files a petition, the NLRB requires employers to post a "Notice to Employees" alerting the employees to the filing. For this reason (among others), it was no secret to the employees that the Union was making a claim to "all Janesville technicians." (Tr. 198, 443).

Leading up to the petition, the Union conducted an investigation into its level of support in Janesville. (Tr. 312). This effort included individual meetings with at least some portion of the Janesville workforce. (Tr. 312).

Bradley Williams ("Williams"), the Union's organizer, agreed that "Generally, where employees perform the same work, in the same place, that typically constitute[s] an appropriate bargaining unit." (Tr. 392). When the Union petitioned for Janesville, it estimated that the eleven (11) voters included "six (6) members of ours" and "five (5) on the non-signatory side" (referring to the former Madison workers or new hires). (Tr. 393, 395). Put another way, the Union projected that it enjoyed majority support when filing the petition. (Tr. 393, 395). In fact, Williams' log includes a May 4, 2020 entry noting that he had "confirmed our 6 to 5 majority." (RX 1).

Williams "election projection" proved erroneous. (RX 1). On May 15, 2020, Williams made the following log entry:

> ADT shifted employee [redacted] to Brookfield ***making RC petition a 5 on 5 campaign***. We withdrew our petition ***at this time***. We will approach the non-signatory branch of this unit and see if we can grab one member for our side. Working with SOC Laskonius on the ***next phase of this***.

(RX 1)(emphasis added).

To recap and put plainly what the government is attempting so desperately to conceal, the state of affairs between the Janesville technicians and the Union as of May 15, 2020 involves the following undisputed facts:

1.  The former Rockford (union) and Madison (non-union) service technicians are clearly working as a single, integrated unit out of the now shared Janesville facility.

2.  The combined Janesville unit, as evidenced by the Union's own petition and inescapable reality, constitutes the only viable "appropriate bargaining unit" given the merger and integration.

3.  Cognizant of this reality, the Union has filed a representation petition seeking the entire facility but under the mistaken belief that it had any election "in the bag."

4.  The existence of the petition and the Union's claim on all of Janesville is clearly known to all employees— including the former Rockford employees, the former Madison employees and new hires.

5.  After making public its intention to claim all of Janesville, the Union withdrew the petition due to a political miscalculation.  The Union cannot "un-ring the bell," however, as employees are aware of its activities.

6.  The Union has not "given up" on claiming to represent all of Janesville but, instead, was actively seeking "one more vote" and approaching "non-signatories" (that is, former Madison employees or new hires) for support.

Up to this juncture, there is no claim or suggestion that the Company has committed any unlawful act with respect to the Janesville facility or any Janesville-based employee.

## IX.   Other Activities Surrounding the Petition.

Having been "put in play" by the Union's petition, certain Janesville employees apparently took action.  Government witness and former Rockford employee/Union member Anderson candidly admitted that he holds a "vested interest" in the Union's continued presence in Janesville.

(Tr. 288).  So motivated, Anderson caught wind of a "decertification effort" and took it upon himself to conduct some "on-line research." (Tr. 298).

Anderson then, of his own accord, initiated a conversation with a former Madison employee whom Anderson suspected of having involvement in the decertification effort. (Tr. 298). Anderson acknowledged he was not acting at the behest of the Company. (Tr. 292-3).  Anderson's investigation ultimately confirmed that the Company was not "behind" the decertification push. (Tr. 293-4).

Union organizer Williams was similarly aware that the decertification effort flowed directly from the Union's botched petition, and not from any Company action/influence. Williams' log includes an entry dated September 15, 2020: "Spoke with [redacted] he stated the move to decert was tech motivated he wouldn't say which tech but they all signed ***did not come from management. He says no replacement yet for [redacted] but interviews have been done***." (RX 1, p. 2) (emphasis added). The Union's own document establishes that the Company had nothing to do with the Janesville employees' union sentiments. (RX 1, p. 2). Williams' reference to a "replacement," moreover, confirms the Union at all times was still seeking the "missing vote" needed to claim all of Janesville. (RX 1, p. 2).

## X.     The Decertification Petition.

Within a week (judging by the signatures) of the Union's "withdrawal" of its petition and while the Union's attempt to find "one more vote" at Janesville was ongoing, certain Janesville employees engaged in a decertification effort. (GCX 14).  Between May 20, 2020 and June 4, 2020, six (6) Janesville technicians signed the decertification petition. (GCX 14).  This number represented the majority of the Janesville service workforce. (Tr. 431).

Nixdorf, the Company's Director of Labor Relations, reviewed the petition and determined that its signatures were in fact authentic. (Tr. 431; RX 2). Nixdorf further recognized that the signatures constituted a majority. (Tr. 432).

As a result, Nixdorf forwarded a June 22, 2020, letter to the Union alerting it to the decertification. (GCX 15).  Notably, Nixdorf's letter ***did not*** immediately withdraw recognition. (GCX 15).  Instead and consistent with applicable NLRB precedent, Nixdorf wrote: "The current collective bargaining agreement is set to expire on August 31, 2020. Absent credible objective evidence the union maintains support of the majority of employees in the bargaining unit in Janesville, WI, ADT will withdraw recognition ***at the expiration of such agreement***."  In other words, the Company's June 22, 2020, letter put the Union on notice of the need to establish majority support within the applicable legal window.  Only at the expiration of that window (absent a showing of required majority status), would the Company withdraw recognition. *Johnson Controls, Inc*., 368 NLRB No. 20 (July 3, 2019) (if an employer has announced its intent to withdraw recognition, the union may attempt to reestablish majority status by filing a representation petition within 45 days from the date the employer gives anticipatory notice of withdrawal of recognition).

The Union failed to follow Board precedent under *Johnson Controls, Inc.,* to establish majority support and, instead, these proceedings ensued.

**XI.    June 22, 2020 to August 31, 2020.**

As noted above, the Union had full and ample lawful opportunity to establish majority status at any time between June 22 and August 31, 2020.  It failed to do so.  Instead, after a prolonged period and with approximately two (2) weeks remaining prior to the labor contract's expiration, the Union filed its first unfair labor practice charge.  That charge led to these

proceedings and the Regional Director's absurd bureaucratic contortions seeking to maintain a minority union in a clearly inappropriate bargaining unit.

<u>**OVERVIEW OF THE REGIONAL DIRECTOR'S LEGAL POSITION**</u>

In the interest of clarity and before addressing the government's specific contentions, an overview of the fundamental legal standards compared to the government's position seems appropriate.

In order to prevail in this matter, the NLRB must establish that the legacy Rockford bargaining unit "maintained its integrity" notwithstanding the Janesville consolidation and despite its now shared interests with other Janesville technicians doing identical work in the same place. Phrased differently, the government must make a threshold showing that an "ex-Rockford only" group constitutes ***at least*** "an appropriate bargaining unit" (but, not necessarily "the most appropriate bargaining unit"). *See, e.g., Overnite Transportation Co.*, 322 NLRB 723, 723-4 (1996). The Regional Director dedicates substantial ink emphasizing Respondent's burden to "establish compelling circumstances" necessary to "overcome bargaining history." (Dkt. 14, p. 24). That burden, however, does not kick in unless and until the Regional Director satisfies the statutory mandate that a majority-selected collective bargaining representative relates to a "unit appropriate for such [collective bargaining purposes]." *See* 29 U.S.C. § 159**.** Failure to satisfy this basic, mandatory statutory requirement ends the inquiry without resort to an analysis of bargaining history or compelling circumstances.

The Board has long held single-site bargaining units (such as all employees working out of Janesville) presumptively appropriate. *See, e.g., J&L Plate, Inc.*, 310 NLRB 429 (1993). The presumption recognizes that employees within the same facility typically share a "community of

interests" sufficient to "justify their mutual inclusion in a single bargaining unit" for purposes of collective bargaining. *American Hospital Ass'n v. NLRB*, 499 U.S. 606, 610 (1991).

"Gerrymandering" or splitting up employees who share the same workplace and perform the same functions presents a significant threat to collective bargaining. *PCC Structurals*, 365 NLRB No. 160 at *6 (Dec. 15, 2017)(employees' interest must be "sufficiently distinct" from those excluded from unit to ensure that "bargaining units do not become arbitrary, irrational or 'fractured'—that is, composed of gerrymandered groups of employees whose interests are insufficiently distinct from those of other employees to constitute that group a separate appropriate unit."). While bargaining history has significance, it cannot (standing alone) justify illogical or misguided division of employees who otherwise share a community of interest. *See, e.g., Turner Industries Group, Inc.*, 374 NLRB 428, 430 (2007)(the weight given to a prior history of collective bargaining is "substantial" but not "conclusive"); *see also Crown Zellerbach Corp.*, 246 NLRB 202, 203 (1979)(the Board "will not adhere to the historical bargaining unit in situations where that unit does not 'conform reasonably well to other standards of appropriateness.'"). In other words, even a substantial bargaining history does not obviate the statutory mandate of an "appropriate" bargaining unit. *See* 29 U.S.C. § 159**.**

In a small number of cases involving unique circumstances, the Board has "re-written" contractual union recognition clauses in order to maintain a historical bargaining unit's viability. The Board's authority to simply "revise contracts" or "impose its own terms" is not without substantial controversy. *See H.K. Porter Co. v. NLRB*, 397 U.S. 99, 108 (1970)(one of the fundamental policies of the Act is freedom of contract and the Act does not permit the Board to compel agreement between the parties). The Regional Director here asks the Court to take the controversial step of "re-drawing" the parties' historical contractual agreement to suit the

government's objectives. (Dkt. 3, p. 4, item I(g) (asking Court to revise the current unit description from one tied to the "Rockford facility" and, by judicial edict, adopt a definition based upon those "who are regularly assigned to work in the service territory of Respondent's former Rockford, Illinois facility.").

Even if the Board (or the Court) properly wields the ability to amend private contracts, it is noteworthy that the Board historically has exercised that right only on exceedingly rare occasions involving facts wholly absent in this matter. For instance, the Board has embarked on contract amendment where a subset of employees at a single facility had highly specialized skill and performed corollary work justifying a finding of a unique and separate unit. *Comar, Inc*., 339 NLRB 903 (2003).  Similarly, the Board has relied on clearly-defined, contractually specified "work jurisdiction" clauses to justify such revisions. *ADT Security Services*, 355 NLRB 1388 (2010), *enfd.* 689 F.3d 628 (6th Cir. 2012).  Finally, an employer's failure to engage in required effects bargaining that might have resulted in sufficiently distinct employment terms has been deemed sufficient to permit "gerrymandering" of employees doing the same work out of the same facility. *Dodge of Naperville v. NLRB*, 739 F.3d 31, 40-1 (D.C. Cir. 2015)(permitting post-consolidation legacy union to remain due to employer's failure to satisfy effects bargaining obligation).

In these highly rare circumstances, however, the Board and the Courts exercise great caution so as to not unduly intrude upon the freedom of contract and to avoid the absurd results associated with illogical gerrymandering of employees who share a common workplace and duties. *See Dodge of Naperville*, 739 F.39  at 40-1 (instructively noting that permitting a legacy unionized workforce to exist side-by-side with non-union personnel performing similar work "gives us

pause" and "is a tougher call" and "our decision is limited to these particular facts" and "it may

turn out that [the employer's] withdrawal of recognition was simply premature").

## ANALYSIS

**I.     The Former Rockford Employees Cannot Constitute a "Stand Alone" Unit.**

Contrary to the Regional Director's confused position, the test here is **_not_** whether certain

aspects of the former Rockford group's employment terms remained unchanged after the

Janesville consolidation. (*See, e.g.*, Dkt. 14, p. 20)(suggesting continuing "to perform the same

work in the same geographic area under largely unchanged terms and conditions of employment"

somehow justifies a gerrymandered unit within a shared facility). Instead, the Regional Director

must establish that the ex-Rockford technicians' working conditions maintained separate "integrity

from" or "remained distinct from" other employees working from the Janesville facility. *See, e.g.,*

*NLRB v. ADT Security Services*, 689 F.3d 628, 635 (6th Cir. 2012). The Regional Director has not

and cannot meet this burden.

The former Rockford and Madison technicians "do the exact same thing" with respect to

the installation and servicing of security systems. (Tr. 73-5, 208-9). They perform this work out

of the same location. (Tr. 81). They drive the same trucks, and wear the same uniforms. (Tr. 74,

311). They hold themselves out to the public in identical fashion. (Tr. 311). They share the same

supervisors and communicate with those supervisors multiple times per day. (Tr. 74, 81, 115, 117,

201, 237). Both pre and post-pandemic, they attend the same operations, product and training

sessions. (Tr. 79-80, 143-5, 195-6). They interact with one other and that interaction increased

(pandemic noted) upon Janesville's opening. (Tr. 140). They share, rely upon and interact with

the same Janesville-based support staff. (Tr. 183-5, 192, 303). Tellingly and unlike the pre-merger

situation, both the former Rockford and Madison employees are aware of promotions, demotions

and departures involving their fellow Janesville employees—whereas before they were only aware of such events involving employees at their assigned (Rockford or Madison) location. (Tr. 189-90). They share the same required licensure for work performed in Illinois. (Tr. 420-1; RX 6). They all expect that workplace issues will be discussed and adjudicated out of the Janesville facility. (Tr. 202, 290-1). Indeed, the government largely concedes (as it must) all of these realities. (Dkt. 14, p. 24)(no dispute employees do the same thing under same supervision under same roof).

## II.     The Government's Precedent Is Inapposite.

Fully aware that the Janesville technicians share an overwhelming community of interest so as to constitute the only viable appropriate unit, the government attempts to pigeon hole these facts into a readily distinguishable case. The Regional Director boldly proclaims that *ADT Security Services* "controls the instant case." (herein referred to as "*ADT*") Contrary to this pronouncement, any similarity between that case and the facts present here ends with the case title.

In *ADT*, the relevant bargaining history involved a labor contract that explicitly defined the bargaining unit's "work jurisdiction." 355 NLRB at 1397 ("The collective bargaining agreement refers to the Kalamazoo 'service territory,' ***jurisdiction over which the union sought to maintain pursuant to the provision in the contract that provided for notification if employees not assigned to Kalamazoo were sent to work in that territory***.")(emphasis added). The contractual boundary remained in tact both before and after the consolidation of the Kalamazoo employees with the another employee group. *Id.* at 1388 ("The previous collective bargaining agreement referred to the Kalamazoo 'service territory,' and, even after the closure of the Kalamazoo facility, the Kalamazoo employees continued to be assigned work in that territory.").  Put another way, the Kalamazoo union had an established, historical and contractually-defined "exclusive claim" to a particular geographic area.

On this basis, the Board (with Court approval) saw fit to amend the contract/certification because doing so merely codified the "boundary lines" *__that the Company and the Union themselves__* had already agreed upon and specifically defined. ADT, 689 F.3d at 636 (Board merely "adopted same methods and distinctions" (*i.e.*, the clear work jurisdiction clause) that the parties themselves had created).

No such "exclusive jurisdiction" has ever existed in this case.  The "Rockford group" works in Illinois, Wisconsin and as far out as Iowa or Minnesota.  Employees from the Chicago office or other locations likewise service the supposed "Rockford area."  The former Madison technicians, both pre and post-merger, hold the licenses necessary to perform security work in Illinois, and have performed work in all regions. (Tr. 72-3, 89, 209, 242, 288, 301).  Indeed, the Regional Director concedes the total absence of "defined boundaries serviced by the Rockford facility." (Dkt. 14, p. 9).

### A.    The Court Should Not Amend the Certification/Contract Based on a Wholly Non-Descript, "*De Facto*" Work Jurisdiction Theory.

Notwithstanding the clear difference between *ADT* and this matter, the Regional Director urges the Court to impose a "*de facto* defined Rockford territory." (Dkt. 14, p. 20).  She explains, "That the distinct geographic work area for the former Rockford employees is defined de facto, *__and not contractually__*, and that the Union was not notified of others working in the Rockford territory, are *__not material differences__*." (Dkt. 14, p. 28-9)(emphasis added). In point of fact, the differences are not only material, they are decisive.

Once again, the original NLRB certification of the Union is expressly tied to a "Rockford facility."  No such facility currently exists, having been replaced with the Janesville operation.  Similarly, the Rockford unit has never enjoyed any jurisdictional or exclusive geographic claim.

Unlike the facts in *ADT*, neither the Board nor this Court may rely upon an existing contractual definition of "jurisdiction" or "geographic control" should it accept the Regional Director's invitation to amend a private collective-bargaining agreement.  *Compare ADT,* 689 F.3d at 636 (even post-consolidation, Company distinguished between service areas and ***assigned only*** Kalamazoo servicemen to work in a ***specific*** subdivision of the Kalamazoo service territory as delineated by a color-coded map)(emphasis added).

Here, the Regional Director has not and cannot establish any similarly clear "jurisdictional boundary" that might possibly preserve the Rockford unit's separate integrity.  This failing, and the associated realities, is fatal to the government's case.

The record establishes that multiple employee groups routinely entered the imaginary "Rockford service territory" over many contract cycles.  Supposed "Rockford work" was performed not only by the non-union Madison folks (who, not coincidentally, have always held an Illinois license), but also by other unionized locations based in Chicago and elsewhere. By the same token, the "Rockford employees" worked in states such as Iowa, Wisconsin and Minnesota notwithstanding the imaginary "*de facto* territory."

These undisputed facts raise questions the Regional Director simply has not (and cannot answer).  Is the Board or the Court now to amend and police a contract in a fashion that forbids licensed former Madison technicians from performing work in Illinois? Is the (unionized) Chicago facility now magically "prohibited" from entering a "Rockford territory" which the government is to create without any historical or contractual guidance or basis?  May the former Rockford employees refuse to report to the Janesville office as "outside their jurisdictional area?" May they decline the "non-Rockford work" (Wisconsin, Iowa, Minnesota, *etc.*) under the Regional Director's contorted theory? If "Rockford work" is insufficient to maintain employment, are they to be laid off

rather than supplemented with work in other states? Finally, when newly-created "Rockford territory" bargaining unit suffers attrition or a decrease in numbers, are those positions to be filled or shall the bargaining unit simply dissipate over time?[3] On what basis? This is but a preview of a myriad of unresolvable questions to flow from the Regional Director's misguided attempt to gerrymander a minority union back into existence.

Beyond this "preview" lurk more fundamental problems the Regional Director blithely ignores. Like Mary Shelley's *Frankenstein*, neither the Regional Director nor Board precedent provide any clue as to how the gerrymandered monster is to be handled once created.

The entire system of collective bargaining is premised on good faith negotiations backed up by the threat (and, occasional exercise) of economic weapons to enforce a party's legitimate demands. A successful union strike creates leverage through employee unanimity and cohesion. Here, the Regional Director seeks to create an "ex-Rockford only" group which, under her theory, would literally work in the same place as the employees who would replace their labor in the event of a "ex-Rockford only" strike. The hardly creates an advantageous bargaining climate for the Union and, essentially, leaves it with little or no leverage whatsoever.

On the flip side, the employer's primary economic weapon is the "lockout" whereby bargaining unit employees re not permitted to work until they accede to employer demands. To avoid favoritism and maintain union cohesion, an employer must (by law) visit the effects of a lockout on an entire bargaining unit, it may not exempt "its favorites" or "anti-union" employees. *Electrical Workers Local 15 v. NLRB*, 429 F.3d 651, 662 (7th Cir. 2005), *cert denied* 127 S.Ct. 42 (2006)("partial lockout" unlawful where, during course of union strike certain employees crossed

---

[3]     In *ADT*, of course, the historical jurisdictional boundary solves the question of attrition and replacement because the union had an exclusive jurisdictional claim to the "Kalamazoo service territory." In that situation, therefore, the Company must replenish/maintain the bargaining unit or cede work in that area to a competitor.

picket line and were permitted to continue work once strike converted to lockout as exempting those employees was "inherently destructive" to union's representational role). Under the Regional Director's skewed view, nothing would prohibit the Company from locking out the "ex-Rockford only" unit during the course of bargaining to enforce lawful and legitimate demands. Unlike the normal lockout scenario where the employer must suffer the loss of its entire normal workforce for the duration of the action, here Janesville would remain operational under the Regional Director's theory. The Company would still enjoy the services of the "non-union" former Madison/new hires, etc. who the Regional Director has "gerrymandered out of" the obviously appropriate "all Janesville" unit. (GCX 12).

Put simply, the Regional Director is not "protecting the public's interest in collective bargaining," but rather turning the entire system upside down and destroying its foundations (employees with the same interest in the same place should be in the same unit, union's economic leverage depends on strike participation and impact on employer site, etc.). The Court should not permit this erosion simply to appease the Regional Director's short-sighted and misguided attempt to save a minority union.

### B.      The Government's Remaining Arguments Cannot Sustain the Complaint.

Having disposed of the General Counsel's lynchpin "geographic distinctness" argument, two (2) other contentions remain.

The government incorrectly claims a lack of evidence regarding the comparative wage rates of the former Madison and Rockford groups. (Dkt. 14, p. 24). The undisputed evidence establishes that both groups shared the same wage rates both before and after the opening of Janesville. (Tr. 425-7; RX 7). This fact, obviously, further differentiates this matter from the Regional Director's cited precedent. *Compare ADT* 689 F.3d at 636 (noting that even after

consolidation the "Kalamazoo servicemen [received] a lower hourly rate and piece rate based on a discernable labor market in the Kalamazoo service territory") *and* 355 NLRB at 1388 (Kalamazoo technicians paid less because "both the location of their work and the resulting wage rates remain distinct").

Finally, Moreover, the government's witnesses, with collective experience at the Rockford facility of approximately eight (8) years, mustered a whopping total of four (4) examples of "call out" occurrences. Obviously, these rare occurrences fall woefully short of overcoming the otherwise overwhelming community of interest shared by the former Rockford and Madison technicians. (Tr. 96, 128, 249).

## APPLICATION OF SECTION 10(J) STANDARDS

The Seventh Circuit holds that a Section 10(j) injunction is an "extraordinary remedy." *NLRB v. Electro-Voice, Inc.*, 83 F. 3d 1559, 1566 (7th Cir. 1996), *citing Szabo v. P\*I\*E Nationwide, Inc.*, 878 F.2d 207, 209 (7th Cir. 1989).  This extraordinary remedy is to be granted only where absolutely necessary.

> Section 10(j) relief should be granted "only in those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process.  Beyond the extraordinary nature of the relief sought, on appeal, the Director must show that the district court abused its discretion in finding that injunctive relief is "just and proper."

The Regional Director may not obtain injunctive relief unless she carries the required burdens of proof on each of the following: 1) likelihood of success on the merits; 2) traditional remedies would be "seriously deficient;" 3) public harm would result absent an injunction; and 4) irreparable harm would occur absent the injunction, and that this harm outweighs any irreparable harm to the employer. *Id*. at 1567-8. The government's case here, as thoroughly exposed by the administrative record, fails on all fronts.

As to likelihood of success on the merits, the unfair labor practice hearing record forecloses the possibility. Indeed, and at the risk of belaboring the obvious, a strong injunction case does not resort to urging a Court to simply ignore testimony offered on cross-examination. (Dkt. 14, p. 26)(noting that the same government witness's admissions on cross-examination "***is undercut***" by his direct testimony). A case with likely success does not rely on "*de facto*" theories. Traditional remedies suffice to remedy any harm, and the public interest is not served by the "gerrymandering" invited by the Regional Director as her contorted theory undermines the very foundations of collective bargaining (private agreement, strike/lockout, employee cohesion and mutual interest). Finally, no irreparable harm exists to the Union here, particularly when compared to the substantial harm that would be inflicted upon the Company should the Court indulge the Regional Director's strained legal theories. Moreover, at minimum, the guidance needed to comply with the Regional Director's desired result here should be fashioned by the Board, and not a Court, with respect to any newly-created jurisdictional lines, subsequent hiring and a myriad of other unanswered questions. *See Kaynard v. Mego Corp*., 633 F.2d 1026, 1035 (2d Cir. 1980)("the issuance of a Section 10(j) injunction diminishes whatever incentive for speed the General Counsel and the charging union might otherwise have had, since a considerable portion of the desired relief has already been obtained. Moreover, in the interval between the grant of an injunction and final adjudication by the Board, the rights of the parties will have been ***determined by a court rather than by the expert agency established by Congress.***")(emphasis added).

One final point bears emphasis. The relevant chain of events here, including the decertification signed by the majority of the Janesville workforce, traces directly to the Union's own political misjudgments and miscalculations. A "just and proper" adjudication simply should not attempt to visit the consequences of those mistakes on the Company, particularly given that

the Company indisputably played no role in the Union's petition or the employee's decertification response.

## <u>CONCLUSION</u>

For the foregoing reasons, ADT respectfully requests that the Regional Director's request for the extraordinary remedy of a preliminary injunction be denied and this matter dismissed with prejudice.

Dated this 26th day of February, 2021.

> */s/ Timothy C. Kamin*
> Timothy C. Kamin
> WI State Bar No. 1034923
> Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
> 1243 North 10th Street, Suite 200
> Milwaukee, WI 53205
> Telephone: (414) 239-6403
> Email: timothy.kamin@ogletree.com

46192912.1